Arlester E. SCOTT, Petitioner,

v.

Jim JONES, Respondent.

No. 88–0183–CV–W–JWO–P.

United States District Court,
W.D. Missouri, W.D.

June 3, 1988.

Application For Stay Pending Appeal
Denied June 22, 1988.

Arlester Eugene Scott, Moberly, Mo., pro se.

William L. Webster, Atty. Gen., State of Missouri, Jefferson City, Mo., for respondent.

## MEMORANDUM AND ORDER GRANTING PETITION FOR HABEAS CORPUS

JOHN W. OLIVER, Senior District Judge.

### I

The first of the seven grounds alleged in the pending State prisoner habeas corpus petition presents the question of whether the petitioner was tried and convicted at a second trial in violation of the prohibition of the Double Jeopardy Clause of the Fifth Amendment that no "person shall be subject for the same offense to be twice put in jeopardy of life or limb." Petitioner was convicted of first degree robbery at his first trial. That conviction was reversed by the Missouri Court of Appeals, Western District, on February 15, 1983 in *State v. Scott*, 647 S.W.2d 601 (Mo.App.1983) (hereinafter *Scott I*) and the case was remanded "for further proceedings consistent with this opinion." *Id.* at 611. *Scott I* expressly noted that:

> The parties have not raised or briefed double jeopardy implications of retrial and a second attempt to establish as competent the fingerprint exhibits. No opinion is expressed here on the subject.

*Id.* at 608.

Petitioner was thereafter again tried and convicted of the same offense at a second trial. Petitioner's motion to dismiss based on double jeopardy grounds was denied by the second trial court. Petitioner's second conviction was affirmed by a different panel of the Missouri Court of Appeals, Western District, on September 3, 1985 in *State v. Scott*, 699 S.W.2d 760 (Mo.App.1985) (hereinafter *Scott II*).

The pending petition for habeas corpus was filed March 3, 1988. Application of controlling federal standards, *see Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), requires that we find and conclude that petitioner is entitled to federal habeas corpus relief under the first ground alleged in his pending petition.

## II

The factual circumstances in regard to petitioner's first trial were established by the Missouri Court of Appeals' decision that reversed the conviction obtained at that trial. *Scott I* reliably found that "[i]n the main, the facts of the crime were uncontroverted, the sole issue being whether the accused, Scott, was one of two men who committed the robbery." 647 S.W.2d at 603. *Scott I* accurately added that:

> The state's evidence initially established that in the early afternoon of March 27, 1981, a robbery was committed at a Milgram's food market in a Kansas City shopping center. The robbers were two black men, one short and the other tall with a full dark beard. Both men wore gloves but were otherwise undisguised.

*Id.* at 603–04.

After stating that the "hypothesis of the prosecution was that Scott was the taller of the two robbers," *Scott I* found that "[n]one of the four store employees, however, made any positive identification of Scott" and that "Scott's implication in the crime rested entirely on a fingerprint com-

parison." [1] *Id.* at 604. Scott's fingerprint "was allegedly recovered by an evidence technician, William Fortner, from a scrap of cardboard retrieved from the floor of the Milgram store manager's office." *Id.*

It was not until after the first prosecution witness had completed his testimony did the prosecutor disclose to the trial court and to defense counsel that "Fortner, the evidence technician, could not be located." *Id. Scott I* stated that "Officer Fortner still had not been located [by] the third day of trial" and that he never testified at petitioner's first trial.[2] *Id.* at 605.

Rather than requesting a recess in order to obtain the presence of Fortner, the State elected to call and rely on the testimony of two witnesses it had failed to endorse as prosecution witnesses as required by State law. In addition, the prosecution had also failed to disclose the names of those witnesses in response to a defense request made pursuant to Rule 25.03 of the Missouri Rules of Criminal Procedure.[3]

*Scott I* reliably found that at "a side bar conference when defense counsel pointed out that disclosure of witnesses Burns and Worlan had only occurred as trial began, the state candidly acknowledged that defense counsel had been unintentionally misled as to the witnesses who would be called." 647 S.W.2d at 606. *Scott I* also found that the "trial court conceded the merit of defendant's objection to use of state's witnesses Burns and Worlan with-

---

1. *Scott I* explained that the "store manager testified he thought Scott was the man but he was uncertain because the tall robber was bearded while, at trial, Scott was clean shaven. The three other employees expressed no opinion on identification of the robbers at all." *Id.*

2. The State's respondent's brief in *Scott II,* advised the Missouri Court of Appeals that "[i]t is clear from the transcript of the appellant's first trial that the State knew that Officer Fortner had, contrary to his earlier assurances, gone deer hunting in Lowry City, Missouri, and would be returning the following day (Tr. I 288–290) [and that] the State could have requested a one-day recess to wait for Fortner's return, or an even shorter recess to locate him in Lowry City." Respondent's Exh. D at 21. *Scott I,* however, made clear that the prosecution did not request a recess to obtain Fortner's

presence at Scott's first trial. Lowry City is approximately 100 miles from Kansas City, Missouri, the place of petitioner's first trial.

3. Rule 25.03, covering "Disclosure by State to Defendant Without Court Order", provides in part that:

> (A) Except as otherwise provided in these Rules as to protective orders, the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request:
> (1) The names and last known addresses of persons whom the state intends to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda, reporting or summarizing part or all of their oral statements.

out prior disclosure and that the state agreed that the context of pre-trial discovery had misled the defense as to prosecution witnesses." *Id.* *Scott I* stated, however, that the State trial "court denied a motion to disqualify Burns as a witness but did declare a recess to permit defense counsel to interview Burns before he testified." *Id.* at 604. In like manner, the State trial court refused "to bar the use of [Worlan as] a surprise witness [but] provided the defense an opportunity to interview Worlan before he testified." *Id.*

*Scott I* reliably found that at the time Burns was called as the State's first surprise witness, he was "portrayed as a routine witness describing the scene of the crime" and that "the state had made no disclosure that Fortner could not be found and that Burns would provide the sole link in the first chain of custody to the critical fingerprint exhibit." *Id.* at 607. *Scott I* accurately stated that "the trial court gave no consideration to granting Scott's motion to bar the state from using witnesses Burns and Worlan but viewed a mistrial or the opportunity to interview the witnesses as the full range of available sanctions." *Id.* at 606. The choice offered by the trial court was "between a mistrial declared sua sponte by the court or an opportunity to interview Burns and Worlan before they testified." *Id.*

*Scott I* makes clear, however, that "defense counsel informed the court Scott did not seek a mistrial" and that, for reasons he stated, Scott wanted "to pursue the trial then in progress in hope of a favorable verdict." *Id.* *Scott I* reliably found that Scott and his attorney "refused the proffered mistrial and made the best of the

interview opportunity, conducted while the court and jury stood by awaiting resumption of proceedings." [4] *Id.*

## III

### A.

*Scott I* noted that the following questions were presented on appeal: "[1] whether the state was entitled to use Burns and Worlan as witnesses after failing to disclose them in pre-trial discovery and, [2] whether the proof from these witnesses was sufficient to establish the integrity of the physical evidence." 647 S.W.2d at 605.

*Scott I* first discussed and ruled "Scott's complaint about both surprise witnesses." 647 S.W.2d at 605. It concluded that the trial court's failure "to sustain defendant's motion to exclude Burns and Worlan for failure of the state to provide timely discovery ... [required that] Scott's conviction must be reversed." *Id.* at 607. *Scott I* explained that "[i]n no other way could the prejudice to Scott's due process rights be effectively removed." [5] *Id.*

*Scott I* further concluded that the "fundamental unfairness of permitting the state to call previously undisclosed witnesses to prove vital elements of the prosecution's case can scarcely be debated." *Id.* at 606. It was further noted that at the time of trial "neither the court nor the prosecuting attorney entertained any doubt that some remedy was required to overcome the prejudice which summoning Burns and Worlan at the eleventh hour had produced." *Id.*

---

**4.** The testimony given by Burns and Worlan and, more important, the Missouri Court of Appeals' view of the sufficiency of that testimony as stated in *Scott I* will be detailed in the next part of this memorandum opinion.

**5.** *Scott I* explained that: "Rights of discovery provided criminal defendants by Rule 25 have constitutional underpinning rooted in due process. *State v. Wilkinson,* 606 S.W.2d 632, 636 (Mo. banc 1980). The basic object of the discovery process in criminal proceedings is to permit defendant a decent opportunity to prepare in advance of trial and avoid surprise, thus

extending to him fundamental fairness which the adversary system aims to provide. *State v. Sykes,* 628 S.W.2d 653, 656 (Mo.1982). The rules of criminal discovery are not mere etiquette nor is compliance to be at discretion. The obligation to make answer is peremptory. *State v. Stapleton,* 539 S.W.2d 655, 659 (Mo.App. 1976). Where the state has failed to respond promptly and fully to the defendant's disclosure request, the question is whether the failure has resulted in fundamental unfairness or prejudice to the defendant. *State v. Dentman,* 635 S.W.2d 28, 32 (Mo.App.1982)." *Id.* at 606.

The Missouri Court of Appeals emphasized that "Scott did not seek and his cause was not furthered by a mistrial which, of course, would have aided the state in providing added time to locate the evidence witness, Fortner." *Id.* at 606–07. It therefore concluded that the due process prejudice suffered by the petitioner under the circumstances, was not eradicated by "the opportunity given defense counsel to interview the witnesses." *Id.* at 607.[6]

After answering the first question of "whether the state was entitled to use Burns and Worlan as witnesses" (*id.* at 605) in the negative, *Scott I* turned to the second question presented on appeal: "whether the proof from those witnesses was sufficient to establish the integrity of the physical evidence." *Id.* That question was also answered in the negative.

*Scott I* expressly held that "[a]ssuming, however, any doubt" as to whether "witnesses Burns and Worlan be disqualified, ... the conviction must nevertheless be reversed because [petitioner's] alternative contention is valid."[7] *Id.* at 607. We turn now to the second question presented on appeal in *Scott I*.

### B.

*Scott I*'s analysis of the sufficiency of the evidence adduced at petitioner's first trial was made in light of its reliable finding that "[n]one of the four store employees ... made any positive identification of Scott" and its finding that "Scott's implication in the crime rested entirely on a fingerprint comparison." 647 S.W.2d at 604. *Scott I* stated that "the crucial nature of the evidence to be supplied by witnesses Burns and Worlan is self-evident" and concluded that "[w]ithout both witnesses, the state plainly had no case." *Id.* at 606.

After a careful analysis of all of the evidence adduced by the state, *Scott I* held that:

> The absence of testimony by Fortner left a material gap in the proof necessary to show with reasonable assurance the exhibit was in fact an article collected at the crime scene. That assurance was of particular importance here where Scott was not shown by other evidence to have had any connection with the exhibit and upon that exhibit alone depended the entitlement of the state to take the case to the jury.[8]

*Id.* at 608.

In support of that ultimate finding, *Scott I* emphasized that the "foundation for admission of the scrap of cardboard from which the fingerprint had allegedly been recovered ... depended on the testimony of Burns and of the store manager in his description of how duct tape had been used

**6.** *Scott I* explained that "an interview with these witnesses during a trial recess fell far short of meeting the standards of due process which the cited cases require. As to Worlan, the fingerprint expert, defense counsel validly protested he was unprepared to confront such a witness, he had developed no format for cross-examination and he had no opportunity to consult with another expert in the field. As to Burns, the interview was ineffective for other reasons. At the time, the state had made no disclosure that Fortner could not be found and that Burns would provide the sole link in the first chain of custody to the critical fingerprint exhibit. Instead, Burns was portrayed as a routine witness describing the scene of the crime." *Id.*

**7.** Scott's "alternative contention" was identified early in *Scott I* by the court's statement that petitioner "first asserts that the tape box was erroneously admitted without proof of a proper chain of custody necessary to establish that the exhibit was in fact the same tape box collected

at the scene of the crime and, if so, whether the box was in the same condition when examined for prints as when taken from the Milgram store." *Id.* at 605. The importance of that question was underlined by *Scott I*'s finding that "upon that exhibit alone depended the entitlement of the state to take the case to the jury." *Id.* at 608. It is thus clear that petitioner's "alternative contention" presented the second question decided in *Scott I* as to "whether the proof from [Burns and Worlan] was sufficient to establish the integrity of the physical evidence." *Id.* at 605.

**8.** *Scott I* explained that the "necessity for Fortner's testimony is underscored by the glaring omission in his official report of any mention of the exhibit" and concluded finally that "there was no proof at all that the exhibit was preserved intact from March 30, the date of the crime, until April 16 when Worlan made his examination." *Id.* at 608.

to bind the store employees' hands."[9] *Id.* at 604.

Burns' testimony did no more than describe "the arrival of police laboratory technician, Fortner, who Burns saw, 'out of the corner of his eye,' going about his work gathering evidence." *Id. Scott I* acknowledged that "[a]ccording to Burns, a box or wrapper which had contained duct tape was on the office floor and this was among the materials Fortner placed in an evidence bag." *Id.*

*Scott I,* however, expressly found that the testimony of Burns "established *only* that some evidence similar in appearance to the piece of cardboard from which the fingerprint had been obtained was gathered by officer Fortner along with other objects and placed in an evidence bag." *Id.* at 607. *Scott I* reliably found that "Burns *could not and did not attempt to state* that the exhibit offered in evidence was one of the items Fortner had retrieved."[10] *Id.* (Emphasis added).

*Scott I* also reliably found that Worlan's testimony, like that of Burns, was insufficient to establish the requisite proof of a chain of custody. For that court stated that "[w]hile Worlan did identify Fortner's initials on the evidence bag, he had no knowledge as to the source of the contents and he was unable to explain why the evidence bag was twice delivered to the crime laboratory." *Id.* In regard to the "inventory report and narrative account authored by Fortner [which was] admitted as a business record," *Scott I* determined that Fortner's written report and account was not sufficient to bridge "the material gap in the proof" for the reason that "[s]ignificantly, the report and Fortner's narrative described in detail the evidence recovered at the crime scene, including the gloves and pieces of duct tape used to bind the victims but neither document made any mention whatever of a duct tape box or a piece of cardboard."[11] *Id. Scott I* accordingly found that "the necessity for Fortner's testimony is underlined by the glaring omission in his official report of any mention of the exhibit." *Id.* at 608.

*Scott I*'s negative answer to the second question as to "whether the proof ... was sufficient to establish the integrity of the physical evidence" (*id.* at 605) was thus based on its express evidentiary sufficiency finding that the "absence of testimony by Fortner left a material gap in the proof necessary to show with reasonable assurance the exhibit was in fact an article collected at the crime scene." *Id.* at 608.

## IV

### A.

After *Scott I* reversed petitioner's first conviction and remanded the case for "further proceedings consistent with the opinion" (647 S.W.2d at 611), a different trial judge set the case for a second trial to commence on August 29, 1983. Exh. A at 2. Consistent with *Scott I*'s recognition of the presence of the double jeopardy question (647 S.W.2d at 608, n. 1), petitioner's newly appointed counsel[12] filed a motion to

---

**9.** The store manager gave no testimony whatsoever at Scott's first trial about seeing any "scrap of cardboard" on the floor of the store. Gruis' expanded testimony at Scott's second trial will be stated in part IV of this memorandum opinion.

**10.** *Scott I* added that "[n]o witness who thereafter testified had any contact with the exhibit during the following two weeks until, on April 16, Worlan opened the evidence bag and examined the contents. There was no testimony as to what Fortner did with the evidence after he left the Milgram store, no testimony as to where the evidence was stored or in what condition or upon what safeguards." *Id.* at 607.

**11.** *Scott I* also noted the deficiencies apparent on the face of the inventory report by stating

that "[a]ccording to the report, the bag was delivered to the Regional Crime Laboratory March 30, it was returned to the Kansas City, Missouri police property room April 1 and was redelivered to the laboratory April 15. The transfers back and forth from the crime laboratory were otherwise unexplained as related to the examination performed by Worlan April 16" *Id.* at 605.

**12.** Petitioner was represented by appointed counsel at petitioner's first trial and on his first appeal. New counsel was appointed to represent petitioner at his second trial and still different counsel was appointed to represent the petitioner on his second appeal.

dismiss on the day petitioner's second trial commenced. That motion alleged that "to permit retrial of this case would violate defendant's right to be free from being twice placed in jeopardy for the same offense in violation of the Fifth Amendment to the United States Constitution." Exh. B at 3. That motion was based on the ground that "the state did not make a submissible case at the first trial of this case" and on the ground that "the introduction of the duct tape box into evidence was … a result of the inability of the state to lay a sufficient foundation at that trial." *Id.*

The motion to dismiss was argued on the day before the second trial commenced. *See* Exh. A at 3–7.[13] The new trial judge peremptorily denied that motion. *Id.* at 7. Petitioner's second trial went as could be easily anticipated. As was true of the second trial in *Ashe v. Swenson*, 397 U.S. 436, 459, 90 S.Ct. 1189, 1202, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring), the prosecution in Scott's second trial "plainly organized its case for the second trial to provide the links missing in the chain of identification evidence that was offered at the first trial." Justice Brennan appropriately noted that the "hesitant and uncertain evi-

dence of Gladson and Roberts at the [Ashe's] first trial became detailed, positive, and expansive at the second trial." [14] *Id.* The same thing may be said of the testimony of Donald Gruis, the store manager, at Scott's second trial.

For *Scott II* establishes that Gruis' testimony at Scott's second trial, like that of Gladson and Roberts at Ashe's second trial, "became detailed, positive, and expansive at the second trial." 397 U.S. at 459. Gruis' memory was so improved by the lapse of time between petitioner's first and second trials that the *Scott II* court was able to conclude that "the identification testimony of Gruis is sufficient to let a jury decide the issue *and the fingerprint is merely added proof.*" 699 S.W.2d at 762 (Emphasis added). *Scott II*'s finding in regard to Gruis' testimony was thus directly contrary to *Scott I*'s finding that "[n]one of the four store employees [including Gruis, the store manager] made any positive identification of Scott." 647 S.W. 2d at 604.[15]

In addition, Gruis' memory was much sharper at the second trial than at the first in regard to the documentary evidence. In order to expand the store manager's testi-

**13.** New defense counsel made clear that we "rely on *United States vs. Burks,* [437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1] Your Honor, which basically holds that if the State or the prosecution fails to make a submissible case at the first trial and the defendant appeals, notwithstanding defendant's prayer in his appeal for the alternative relief of a new trial, it does violate the double jeopardy provision to retry the defendant under those circumstances." Exh. A at 4. He further argued that "it is clear from the opinion on appeal that there was not a submissible case made by the tentative identification by Mr. Gruis" (*id.* at 5) and that "[t]hey have had their shot at him, they had a chance to marshal all the evidence they could, they didn't have enough, and [that] it would violate the double jeopardy provisions to give them another shot at another bite of the apple, if you will." *Id.* at 6.

**14.** As the trial judge in *Ashe v. Swenson,* we implicitly invited the Supreme Court to reexamine its earlier double jeopardy cases and to reverse our denial of habeas corpus relief in that case. *See* 397 U.S. at 440 n. 4, 90 S.Ct. at 1192 n. 4 and accompanying text. The Court did so. Justice Brennan's concurring opinion stated the reason our invitation for reversal was

extended when he said that "[o]ne must experience a sense of uneasiness with any double-jeopardy standard that would allow the State this second chance to plug up the holes in its case. The constitutional protection against double jeopardy is empty of meaning if the State may make 'repeated attempts' to touch up its case by forcing the accused to 'run the gantlet' as many times as there are victims of a single episode." 397 U.S. at 459, 90 S.Ct. at 1202.

**15.** *Scott I* found that the "store manageer testified [that] he was uncertain because the tall robber was bearded, while at trial, Scott was clean shaven." 647 S.W.2d at 604. *Scott II* stated that Gruis testified at the second trial that he could identify Scott as the robber because "the taller robber wore an 'apple hat' [which] he wore … every time he was in the store." *Id.* at 761. At the second trial Gruis apparently repeated his testimony that the "defendant was clean shaven and the robber had a beard." *Id.* at 765. While that circumstance made his identification at the first trial "uncertain" (647 S.W. 2d at 604), by the time of the second trial, Gruis testified that in spite of that circumstance, he was "'90%' positive in his identification" of Scott. 699 S.W.2d at 765.

mony at the second trial, Gruis was shown "a photograph of the scene depicting the duct tape box." *Id.* That photograph had been taken by Fortner when he "photographed the scene to show the location of the various items seized for evidence." *Id.* *Scott II* stated that "Witness Gruis testified that this was the box the robbers left behind." *Id.* One must experience a sense of uneasiness as to why, in light of the difficulties of proof the prosecution faced at the first trial, Gruis' testimony at the second trial was not elicited at Scott's first trial.

*Scott II*, of course, could not avoid making a finding that "the cardboard was not specifically listed as being in state's exhibit 17." *Id.* at 764. *Scott II*, however, made a finding that "[t]here can be little doubt concerning the chain of custody of the duct tape card." *Id.* at 765. That finding, of course, was directly contrary to the finding made in *Scott I* that there was "a material gap in the proof necessary to show with reasonable assurance the exhibit was in fact an article collected at the crime scene" and that such lack of proof was "underscored by the glaring omission in [Fortner's] report of any mention of the exhibit." 647 S.W.2d at 608.[16]

*Scott II* establishes that Fortner, the missing witness at Scott's first trial, was called as witness at the second trial. Interestingly enough, the transcript of the second trial establishes that the trial court concluded that Fortner's testimony at the second trial that he had a "vague recollection" of putting the fingerprint exhibit in the evidence bag (699 S.W.2d at 764) was not sufficient to close what *Scott I* held was a "material gap in the proof" that was necessary to establish that the duct tape container "was in fact collected at the crime scene." 647 S.W.2d at 608. For the transcript of the second trial shows that when the State offered Exhibit 18 (the fingerprint exhibit) in evidence during the course of Fortner's testimony (Exh. A at 257), the trial court sustained defense counsel's objection to the admission of that exhibit in evidence. *See* Exh. A at 261. The record of the second trial establishes why that objection was sustained. That record shows that Fortner confirmed the fact that he had not listed the duct tape container in his Inventory Report (Exh. A at 258) and that he had not mentioned the piece of cardboard in his typewritten report of his investigation. *Id.* at 259. As we have noted, *Scott II* made an express finding that Fortner testified he had only "a vague recollection of placing" the piece of cardboard that later became Exhibit 18 inside a manila envelope [Exhibit 17] which was marked as containing pieces of duct tape. 699 S.W.2d at 764.[17]

Thereafter, however, the piece of cardboard exhibit from the duct tape container,

16. Cation's live testimony at the second trial (she was not called as a witness at the first trial) was simply to the effect that the evidence collected at the scene "was logged into the lab on March 30, 1981, and released to the property room April 1, 1981. On April 15, 1981, Cation logged it back to the lab and out on April 17, 1981." 699 S.W.2d at 763. That testimony does not reflect how Worlan came into possession of the exhibit for his examination on April 16, 1981. Nor did Cation's testimony close the gap in the chain of custody noted in *Scott I* when that court stated that "[w]hile Worlan did identify Fortner's initials on the evidence bag, he had no knowledge as to the source of the contents and he was unable to explain why the evidence bag was twice delivered to the crime laboratory." 647 S.W.2d at 607.

17. The record shows that Fortner testified as follows:

Q. You don't really remember throwing this in with the duct tape, do you?
A. Vaguely.
Q. Vaguely, but it's no place in any of your reports?
A. Right.

. . . . .

Q. So ... after never having testified about this case, not having included anything about any piece of cardboard in your report, not having listed it on your property inventory, ... you come in and say you vaguely recollect picking up a piece of cardboard and throwing it in with the duct tape in Item 2, Exhibit 17?
A. Yes, sir.
Q. But you don't know that this, State's Exhibit 18, and no other piece of cardboard is the one that you picked up, do you?
A. No, I can't remember that.
Q. And you don't know what condition it was in relative to the condition it is in now at the time that you picked it up, can you?
A. No, sir.
Exh. A at 270–72.

was reoffered and admitted in evidence on the basis of Worlan's testimony at Scott's second trial. Worlan, of course, gave substantially the same testimony at the second trial that he gave at Scott's first trial. The sharp contrast between *Scott I* and *Scott II*'s determination of the sufficiency of the evidence was most vividly illustrated by how each court viewed Worlan's testimony.[18] *Scott I* expressly found that Worlan "had no knowledge as to the source of the contents [of] the evidence bag" (647 S.W.2d at 607) and concluded that his testimony at the first trial was insufficient to establish the requisite proof of a proper chain of custody.[19] *Scott II,* on the other hand, made a directly contradictory finding that Worlan's reiterated testimony supported a conclusion that there "can be little doubt concerning the chain of custody of the duct tape card." 699 S.W.2d at 765.

*Scott II* apparently felt free to reject *Scott I*'s determination of the insufficiency of Worlan's testimony on the theory that it "would be a high price indeed for society to pay were every accused granted immunity from punishment because of any doubt sufficient to cause reversible error in the proceedings leading to conviction." 699 S.W. 2d at 762 (quoting *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964)).[20] Surely the Double Jeopardy Clause must be said to bar a second trial at which a directly contrary appraisal may be made of the sufficiency of the same testimony given by the same prosecution witness at a defendant's first trial.[21] The same thing is true of all the ultimate evidentiary sufficiency findings made in *Scott I.*

### B.

*Scott II* simply did not address the evidentiary insufficiency ground upon which *Scott I* reversed petitioner's conviction at the first trial. *Scott II* apparently accepted the State's argument made in its Respondent's brief (Exhibit D) that *Scott I*'s second ground for reversal was simply "dicta." For the State there argued that "the reversal of his [petitioner's] initial conviction was based *solely* upon the allegedly erroneous admission of the testimony of two unendorsed witnesses, *and not on the basis of evidentiary insufficiency.*" Exh. D at 14–15 (Emphasis added).[22]

The State argued on appeal in its *Scott II* Respondent's brief that *Scott I*'s determination (1) that there was a material gap in the proof necessary to establish the requisite chain of custody over the fingerprint exhibit, (2) that its finding that the evidence was insufficient to establish that the fingerprint exhibit had in fact been collected at the scene of the crime, and (3) that its finding that there was no proof that the exhibit was preserved intact from the date of the crime until it was examined by Wor-

---

**18.** *Scott II* spelled the witness' name "Warlen," rather than "Worlan," as did *Scott I.* There can be no doubt, however, that both courts were referring to the same witness.

**19.** *Scott I* expressly found that the fact Worlan testified he found a piece of "cardboard from a box indicated to have contained duct tape" in the evidence bag when he opened it (647 S.W.2d at 605), was not sufficient to bridge the "material gap in the proof necessary to show that ... the exhibit was in fact an article collected at the crime scene." 647 S.W.2d at 608.

**20.** While that passage of *Tateo* is frequently quoted for the purpose of directing attention to the juridical pressures that are present in the determination of every double jeopardy case, it is doubtful whether the actual holding of *Tateo* can be said to survive the Court's express holdings in *Ashe v. Swenson, supra,* and in *Burks.*

**21.** *Scott II*'s effort to bolster its rejection of *Scott I*'s appraisal of the sufficiency of Worlan's reiterated testimony is untenable. *Scott II*'s suggestion that Scott made "no showing of tampering" and its statement that to "speculate that the evidence had been tampered with is without foundation" (*id.* at 765) is obviously based on the untenable notion that unless the defendant carried the burden of establishing that the evidence bag had been tampered with, the unlisted fingerprint exhibit was properly admitted in evidence. The burden, of course, as both *Scott I* and *Scott II* properly recognized, rested on the prosecution to adduce sufficient evidence to satisfy the requisite proof of the chain of custody.

**22.** The State further argued in that brief that "it was unnecessary for [the *Scott I*] Court to consider the validity of a separate, but related claim, *i.e.,* that notwithstanding the testimony of Burns and Worlan the State failed to establish a proper chain of custody over the tape duct box." Exh. D at 13.

lan were all made and contained in "several paragraphs of *dicta.*" *Id.*[23]

The State argued, and the *Scott II* court apparently accepted its argument, that *Scott I*'s evidentiary insufficiency findings were "not only *dicta,* but erroneous *dicta* as well." *Id.* at 14. Indeed, the State argued in *Scott II* that *Scott I* should have affirmed petitioner's conviction at the first trial and that *Scott I* erred when it reversed Scott's first conviction. On page 18 of its *Scott II* brief, for example, the State argued that "the *dicta* in *Scott* which seems to hold that the State was unable to lay a proper foundation for the admission of the duct tape box without Fortner's testimony is patently contrary to the record made at the first trial." *Id.* at 22. The State further argued that "although the *Scott dicta* insists 'that there was no proof at all that the exhibit was preserved intact from March 30, the date of the crime, until April 16 when Worlan made his examination', *id.* 647 S.W.2d at 608, this assertion also is contradicted by the record made at the first trial." [24] *Id.* at 22–23.

In its consideration of the double jeopardy question presented, this Court is required to accept the facts reliably found in *Scott I* rather than the contrary findings made after Scott was subjected to a second trial. For we are satisfied that *Scott II* failed to properly apply controlling federal standards when it concluded that Scott's second trial was not barred by the Double Jeopardy Clause. We turn now to that question.

## V

### A.

*Scott II* failed to apply controlling federal standards when it relied on *dicta* quoted from page 15 of *Burks* (437 U.S. at 15, 98 S.Ct. at 2149) to support its erroneous conclusion that the trial court's failure "to sustain defendant's motion to exclude witnesses for failure of the state to provide timely discovery" must be considered as "an incorrect ruling on the receipt of evidence [which] does not give rise to double jeopardy." 699 S.W.2d at 763.[25] *Burks,* in our judgment, cannot be said to hold that an appellate reversal based on a trial court's failure to grant a defense motion to exclude surprise witnesses called in violation of a specific rule of court may properly be considered nothing more than something labeled as a "trial error" for double jeopardy purposes. Nor, in our judgment, can it be said that *Burks* held that an appellate reversal based on express findings that the prosecution had failed to offer proof sufficient to establish the requisite chain of custody of a fingerprint exhibit may properly be considered as nothing more than something labeled as a "trial error" for double jeopardy purposes.

For *Burks* "squarely presented ... the question of whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the

---

**23.** The State repeated its *"dicta"* argument on page 18 of its *Scott II* Respondent's brief by stating: "As heretofore noted, the case was reversed by this Court because of the trial court's admission of the testimony of two unendorsed witnesses. Although unnecessary to the disposition of the appeal, this Court also held, in *dicta,* that the State had failed to establish a proper chain of custody over the duct tape box. *State v. Scott, supra,* 647 S.W.2d at 606–608[1–9]." Exh. D at 18.

**24.** In other portions of its brief, the State somewhat disrespectfully stated that *Scott I* was based on a *"dubious* theory" (*id.* at 12) (emphasis added); that *Scott I "inexplicitly* [held] that the testimony of the two witnesses should have been excluded" (*id.* at 13) (emphasis added); and that the *"dicta* in *Scott I* ... is simply

impossible to rationally explain." *Id.* at 24. This Court does not agree with the State's view of the Missouri Court of Appeals' carefully considered opinion in *Scott I.*

**25.** *United States v. Opager,* 616 F.2d 231, 236 (5th Cir.1980), quoted the same language from *Burks* that *Scott II* quoted to support its erroneous ruling. The Fifth Circuit properly recognized that the language quoted by *Scott II,* which *Opager* also quoted, is, in fact, "dicta." Certainly it cannot be said that *Burks'* actual holding established some sort of a *per se* rule that all appellate reversals that may be based in part on the "incorrect receipt or rejection of evidence" must be what *Burks* labeled in its *dicta* as a "trial error" and therefore outside the coverage of the Double Jeopardy Clause.

verdict of the jury." [26] 437 U.S. at 5, 98 S.Ct. at 2144. The Court unanimously answered that question in the negative. In doing so the Court expressly overruled *Bryan v. United States,* 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), and generally rejected the rationale earlier stated in *Sapir v. United States,* 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955), *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), and *Forman v. United States,* 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960).[27]

*Burks* recognized that the "Court's holdings in this area, beginning with *Bryan,* can hardly be characterized as models of consistency and clarity." 437 U.S. at 9, 98 S.Ct. at 2146. It later added that "our past holdings do not appear consistent with what we believe the Double Jeopardy Clause commands." [28] *Id.* at 12, 98 S.Ct. at 2147. In its reconsideration of *Bryan,* the Court noted that the "somewhat cursory examination of the double jeopardy issue" made in that case was limited to the Court's citation of *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), and *Trono v. United States,* 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292 (1905), both of which were based on short quotations from one part of the leading case of *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896).

*Burks* noted that *Resweber* cited *Ball* to support a broad statement that "where the accused successfully seeks review of a conviction, there is no double jeopardy upon a new trial" and that *"Trono* made a similar comment, citing *Ball* for the proposition that 'if the judgment of conviction be reversed on [the defendant's] own appeal, he cannot avail himself of the once-in-jeopardy provision as a bar to a new trial of the offense for which he was convicted.'" 437 U.S. at 12, 98 S.Ct. at 2148. *Burks* thus concluded that:

> The common ancestor of these statements in *Resweber* and *Trono,* then, is *United States v. Ball,* which provides a logical starting point for unraveling the conceptual confusion arising from *Bryan* and the cases which have followed in its wake. This is especially true since *Ball* appears to represent the first instance in which this Court considered in any detail the double jeopardy implications of an appellate reversal. *North Carolina v. Pearce,* 395 U.S. 711, 719–720 [89 S.Ct. 2072, 2077–2078, 23 L.Ed.2d 656] (1969).

*Id.* at 13, 98 S.Ct. at 2148.

*Burks* stated that *"Ball* came before the Court twice, the first occasion being on

---

**26.** *Burks* did not present a claim that "the trial court committed error by excluding prosecution evidence which, if received, would have rebutted any claim of evidentiary insufficiency." *Id.* Nor does this case present such a question.

**27.** This Court was required to follow *Bryan* in *United States v. Roe,* 213 F.Supp. 444, 455 (W. D.Mo.1963), in a case which presented the same factual situation presented in *Burks.* In determining whether "our order setting aside the verdict [on the ground of the insufficiency of the government's evidence] shall order a new trial or enter judgment of acquittal" we afforded the government the post trial opportunity "to make a preliminary showing that it has competent substantial evidence that could be adduced on a second trial that could be said to make a jury issue in regard to the crucial question of whether the defendant was sane at the time he gave his Section 2255 testimony." *Id.* at 456. The government subsequently stated it could not make such a showing; a judgment of acquittal was accordingly entered pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Under the rule of *United States v. Martin Linen Supply,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), most recently unanimously ap-

proved in *Smalis v. Pennsylvania,* 476 U.S. 140, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986), such an order would bar a second trial.

**28.** In *Crist v. Bretz,* 437 U.S. 28, 32, 98 S.Ct. 2156, 2159, 57 L.Ed.2d 24 (1978), decided the same day as *Burks,* the Court noted that the "deceptively plain language [of the Double Jeopardy Clause] has given rise to problems both subtle and complex, problems illustrated by no less than eight cases argued here this very Term." And in *United States v. DiFrancesco,* 449 U.S. 117, 127, 101 S.Ct. 426, 432, 66 L.Ed.2d 328 (1980), the Court stated that application of the Clause in the "host of recent cases ... has not proved to be facile or routine is demonstrated by acknowledged changes in direction or in emphasis." The increased volume of double jeopardy cases that the Court has been recently required to consider was occasioned by the Omnibus Crime Control Act of 1970, 18 U.S.C. § 3731, which granted the government the right to appeal any case in which appellate disposition would not violate the Double Jeopardy Clause.

writ of error from federal convictions for murder" and that "those defendants who had been found guilty obtained a reversal of their convictions due to a fatally defective indictment." *Id. Burks*, however, did not mention that the first appeal, reported in 140 U.S. 118, 11 S.Ct. 761, 35 L.Ed. 377 (1891), established that the initial indictment in the case, dated October 17, 1889, charged three defendants, M.F. Ball, J.C. Ball, and R.E. Boutwell, with the murder of William T. Box. In *Ball I* the jury in the first joint trial of all three defendants found "the defendants J.C. Ball and R.E. Boutwell, guilty as charged in this indictment, and we find M. Filmore Ball not guilty." 140 U.S. at 122, 11 S.Ct. at 763.

As noted in *Burks*, two of the defendants, J.C. Ball and R.E. Boutwell, appealed and obtained "a reversal of their convictions due to a faulty indictment." The Court entered an order that "[t]he judgments are reversed and the cause remanded, with a direction to quash the indictment, and for such further proceedings in relation to the defendants as to justice may appertain." 140 U.S. at 136, 11 U.S. at 768. M.F. Ball, the acquitted defendant, of course, did not appeal the verdict of not guilty the jury returned in regard to him.

*Burks* also failed to state that a second indictment was returned on June 26, 1889 which, in spite of Millard Filmore Ball's acquittal at the first trial, again charged all three defendants with Box's murder. *See* 163 U.S. at 663, 16 S.Ct. at 1192. *Ball II* noted that to "this indictment Millard F. Ball filed a plea of former jeopardy and former acquittal, relying upon the trial, the verdict of acquittal, and the order of the court for his discharge, upon the former indictment." 163 U.S. at 665, 16 S.Ct. at 1193. It was also noted that the "defendants John C. Ball and Boutwell filed a plea of former jeopardy, by reason of their trial and conviction upon the former indictment, and of the dismissal of that indictment." *Id.* The trial court overruled the former jeopardy pleas of all three defendants; all three were found guilty at the second trial;

and all three were sentenced to death. *Id.* at 665–66, 16 S.Ct. at 1193.

*Burks* makes no reference to the fact that the first question considered in *Ball II* was the double jeopardy question presented by "the acquittal of Millard F. Ball by the jury upon the trial of the former indictment." *Id.* at 666, 16 S.Ct. at 1193. For reasons stated in detail *Ball II* held that "the verdict of acquittal was conclusive in favor of Millard F. Ball; and as to him the judgment must be reversed, and judgment rendered for him upon his plea of former acquittal." *Id.* at 671, 16 S.Ct. at 1195.

*Ball II* expressly refused to follow the rule recognized in England which then provided that "an acquittal upon an indictment so defective that, if it had been objected to at the trial, or by motion in arrest of judgment, or by writ of error, it would not have supported any conviction or sentence, has generally been considered as insufficient to support a plea of former acquittal." [29] *Id.* at 666, 16 S.Ct. at 1193. *Ball II* concluded that the English doctrine "appears to us to be unsatisfactory in the grounds on which it proceeds, as well as unjust in its operation upon those accused of crime." *Id.* at 669, 16 S.Ct. at 1194. In regard to Millard F. Ball's conviction at the second trial, *Ball II* therefore concluded that:

As to the defendant who had been acquitted by the verdict duly returned and received, the court could take no other action than to order his discharge. The verdict of acquittal was final, and could not be reviewed, on error or otherwise, without putting him twice in jeopardy, and thereby violating the Constitution. However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offence.

*Id.* at 671, 16 S.Ct. at 1195.

It is thus apparent that *Ball II*, contrary to the rule in England and the rule that

**29.** *Ball* noted that "the general tendency of opinion in this country has been to the same effect." *Id.*

was then followed in most American jurisdictions, established the fundamental rule that a verdict of acquittal is to be given paramount recognition in the decision of double jeopardy questions.

*Ball II* also held, as *Burks* pointed out, that the pleas of John C. Ball and Robert E. Boutwell were properly denied because "upon a writ of error sued out by themselves the judgment and sentence against them were reversed, and the indictment ordered to be dismissed." *Id.* at 672, 16 S.Ct. at 1195. *Ball II,* however, said nothing about reversals of convictions based on "trial error," as the *Burks' dicta* suggested. Rather, *Ball II* simply stated that "it is quite clear that a defendant, who procures a judgment against him upon an indictment to be set aside, may be tried anew upon the same indictment, or upon another indictment, of the same offence of which he had been convicted" and that the "court therefore rightly overruled their plea of former jeopardy...." *Id.*

It must be recognized that *Ball II* did no more than establish an exception to the Double Jeopardy Clause. 3 W. LaFave & J. Israel, *Criminal Procedure,* § 24.4 at 85 (West 1984), accurately states that in "the seminal double jeopardy decision of *United States v. Ball,* the Supreme Court recognized an exception to the general constitutional prohibition against reprosecuting a person for an offense of which he has already been convicted." *Burks'* precise holding, as distinguished from its *dicta,* held that the considerations that permit a second trial under *Ball II's* exception to the mandate of the Double Jeopardy Clause simply does not apply "when a defendant's conviction has been overturned due to a failure of proof at trial [for the reason] ... the prosecution ... has been given one fair opportunity to offer whatever proof it could assemble." 437 U.S. at 16, 98 S.Ct. at 2149–50.

Of paramount importance, *Burks* made clear for the first time that it is immaterial for double jeopardy purposes whether a judgment of acquittal is entered pursuant to a jury verdict of acquittal or whether such a judgment is entered on an appellate court's determination that the prosecution failed to adduce sufficient evidence to support the defendant's conviction. The Court explained that "[i]n holding the evidence insufficient to sustain guilt, an appellate court determines that the prosecution has failed to prove guilt beyond a reasonable doubt." *Id.* at 16 n. 10, 98 S.Ct. at 2150 n. 10. *Burks* further explained that:

> [A]n appellate reversal [based on evidentiary insufficiency grounds] means that the government's case was so lacking that it should not have even been *submitted* to the jury. Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty. (The Court's emphasis).

. . . . .

> Given the requirements for entry of a judgment of acquittal, the purposes of the Clause would be negated were we to afford the government an opportunity for the proverbial "second bite at the apple."[30]

*Id.* at 16, 17, 98 S.Ct. at 2150.

It is also important to note that *Burks,* on its facts, involved a jury verdict of guilty rather than a jury verdict of acquittal as was the situation in regard to Millard F. Ball in *Ball II. Burks* concluded that "it should make no difference that the *reviewing* court, rather than the trial court, determined the evidence to be insuffi-

---

**30.** *Burks* also made clear that "[s]ince we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal. To the extent that our prior decisions suggest that by moving for a new trial, a defendant waives his right to a judgment of acquittal on the basis of

cient." [31] *Id.* at 11, 98 S.Ct. at 2147 (The Court's emphasis).

*Burks* flatly held that:

The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials.

*Id.*

And in footnote 6, *Burks* emphasized that "where the Double Jeopardy Clause is applicable, its sweep is absolute" for the reason "the Clause has declared a constitutional policy, based on grounds which are not open to judicial examination." *Id.* In short, the Court sustained the defendant's argument that the appellate reversal involved in *Burks* must be considered as "the operative equivalent of a district court's judgment of acquittal." *Id.* at 5, 98 S.Ct. at 2144.[32]

**B.**

*Burks'* application of the Court's "implicit-acquittal principle" [33] was consistent with the Court's earlier double jeopardy precedents. For the notion that the Double Jeopardy Clause is limited to jury verdicts of acquittal was expressly rejected in *Unit-*

ed States v. Martin Linen Supply Co., 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). *Martin Linen* involved a hung jury. The district court, however, granted a post trial motion for acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.

The government presented the argument that "only a verdict of acquittal formally returned by a jury should absolutely bar further proceedings." *Id.* at 572, 97 S.Ct. at 1355. The Court rejected that argument for the reason that "it is plain that the District Court in this case evaluated the Government's evidence and determined that it was legally insufficient to sustain a conviction." *Id.*

In support of its rejection of the government's argument, the Court quoted from *Ball,* from *Fong Foo v. United States,* 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962), and cited *Kepner v. United States,* 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904); *United States v. Sisson,* 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970), and *Serfass v. United States,* 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975). The Court then concluded that:

In applying this teaching of *Ball, Fong Foo,* and like cases, we have emphasized that what constitutes an "acquittal" is not to be controlled by the form of the

---

evidentiary insufficiency, those cases are overruled." 437 U.S. at 18, 98 S.Ct. at 2150–51.

**31.** That conclusion in *Burks* was based on the following reasons: "It is unquestionably true that the Court of Appeals' decision 'represente[d] a resolution, correct or not, of some or all of the factual elements of the offense charged.' *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571 [97 S.Ct. 1349, 1355, 51 L.Ed.2d 642] (1977). By deciding that the Government had failed to come forward with sufficient proof of petitioner's capacity to be responsible for criminal acts, that court was clearly saying that Burks' criminal culpability had not been established. If the District Court had so held in the first instance, as the reviewing court said it should have done, a judgment of acquittal would have been entered and, of course, petitioner could not be retried for the same offense. See *Fong Foo v. United States,* 369 U.S. 141 [82 S.Ct. 671, 7 L.Ed.2d 629] (1962); *Kepner v. United States,* 195 U.S. 100 [24 S.Ct. 797, 49 L.Ed. 114] (1904)." 437 U.S. at 10–11, 98 S.Ct. at 2147.

**32.** *Burks* expressly overruled *Bryan* and held that in an evidentiary insufficiency case, the Double Jeopardy Clause *does not permit the use* of some sort of "balancing of the equities" test. In doing so, we believe that it can fairly be said that *Burks* implicitly accepted the rationale of Justice Goldberg's dissent in *Tateo* when he said "[t]he Court's final point is that its decision is necessary to protect 'the societal interest in punishing one whose guilt is clear'—an interest which the Court here prefers to the right of an accused not to be subjected to double jeopardy. *Ante,* at 466, 84 S.Ct. at 1589. With all deference, I suggest that the Constitution has resolved this question of competing interests of the Government and the individual in favor of protecting the individual from the harassment and danger of reprosecution." *United States v. Tateo,* 377 U.S. 463, 475, 84 S.Ct. 1587, 1594, 12 L.Ed.2d 448 (1964) (Goldberg, J., dissenting).

**33.** *Bullington v. Missouri,* 451 U.S. 430, 451, 101 S.Ct. 1852, 1864, 68 L.Ed.2d 270 (Powell, J., dissenting) (1981).

judge's action. *United States v. Sisson, supra,* at 270 [90 S.Ct. at 2119]; *cf. United States v. Wilson,* 420 U.S. [332] at 336 [95 S.Ct. 1013 at 1018, 43 L.Ed.2d 232 (1975)]. Rather, we must determine whether the ruling of the judges, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.

430 U.S. at 571, 97 S.Ct. at 1354.

*Martin Linen* further held that the familiar principles stated in *United States v. Perez,* 9 Wheat. 579, 6 L.Ed. 165 (1824), were not to be applied in that case for the reason that "valid judgments of acquittal were entered" by the district court pursuant to Rule 29(c) and because "a successful governmental appeal reversing the judgments of acquittal would necessitate another trial, or, at least, 'further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged....' *United States v. Jenkins,* 420 U.S. 358, 370 [95 S.Ct. 1006, 1013, 43 L.Ed.2d 250] (1975)." *Id.* at 570, 97 S.Ct. at 1354.

The standard articulated in *Martin Linen* was expressly approved by the Court's recent unanimous opinion in *Smalis v. Pennsylvania,* 476 U.S. 140, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986). In that case the state trial court granted a defense demurrer at the close of the prosecution's case in chief on the ground that the state's evidence was insufficient to support a verdict of guilty. The Court stated that "[o]ur past decisions, which we are not inclined to reconsider at this time, hold that such a ruling is an acquittal under the Double Jeopardy Clause. See, e.g., *United States v. Martin Linen Supply Co.,* 430 U.S. 564 [97 S.Ct. 1349, 51 L.Ed.2d 642] (1977); *Sanabria v. United States,* 437 U.S. 54 [98 S.Ct. 2170, 57 L.Ed.2d 43] (1978)." 476 U.S. at 144, 106 S.Ct. at 1748.[34]

*Smalis* concluded that the Superior Court of Pennsylvania, rather than the Supreme Court of Pennsylvania, was correct when it held that "the Double Jeopardy Clause bars a postacquittal appeal by the prosecution not only when it might result in a second trial, but also if reversal would translate into ' "further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged." ' *Martin Linen, supra,* [430 U.S.] at 570 [97 S.Ct. at 1354]."[35] *Id.* at 145–46, 106 S.Ct. at 1749. The Court made clear that the "fact that the 'further proceedings' standard which the Superior Court quoted from *Martin Linen* was first articulated in *United States v. Jenkins,* 420 U.S. 358, 370 [95 S.Ct. 1006, 1013, 43 L.Ed.2d 250] (1975), does not detract from its authority" for the reason that although *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), overruled a part of *Jenkins,* the standard cited in that case was not disapproved. *Id.* 476 U.S. at 146 n. 9, 106 S.Ct. at 1749 n. 9.

**34.** In *Sanabria* the Court stated that "[w]e have recently defined an acquittal as ' "a resolution, correct or not, of some or all of the factual elements of the offense charged." ' " 437 U.S. at 71, 98 S.Ct. at 2182–83. Although the district court's grant of a defense motion for acquittal was based on what "is properly to be characterized as an erroneous evidentiary ruling, which led to an acquittal for insufficient evidence" (*id.* at 68–69, 98 S.Ct. at 2181), the Court concluded that the trial court's "finding of fact stands as an absolute bar to any further prosecution for participation in that business." *Id.* at 72–73, 98 S.Ct. at 2183.

**35.** The Court noted that the Superior Court "set out two relevant principles of law. First, a judgment that the evidence is legally insufficient to sustain a guilty verdict constitutes an acquittal for purposes of the Double Jeopardy Clause. See, *e.g., United States v. Martin Linen Supply Co.,* 430 U.S. 564 [97 S.Ct. 1349, 51 L.Ed.2d 642] (1977); *Burks v. United States,* 437 U.S. 1 [98 S.Ct. 2141, 57 L.Ed.2d 1] (1978); *Sanabria v. United States,* 437 U.S. 54 [98 S.Ct. 2170, 57 L.Ed.2d 43] (1978); *United States v. Scott,* 437 U.S. 82, 91 [98 S.Ct. 2187, 2193, 57 L.Ed.2d 65] (1978) (dicta); *Hudson v. Louisiana,* 450 U.S. 40 [101 S.Ct. 970, 67 L.Ed.2d 30] (1981). Second, when a trial court enters such a judgment, the Double Jeopardy Clause bars an appeal by the prosecution not only when it might result in a second trial, but also if reversal would translate into further proceedings devoted to the resolution of factual issues going to the elements of the offense charged" and that it "concluded that because reversal of the trial court's granting of petitioners' demurrer would necessitate further trial proceedings, the Commonwealth's appeal was improper under *Martin Linen.*" 476 U.S. at 142, 106 S.Ct. at 1747.

That standard is therefore applicable to this case.

### C.

*Martin Linen* is particularly important to the determination of this case for the reason that *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), was cited with approval in connection with the Court's discussion of the constitutional principle stated in the Double Jeopardy Clause. 430 U.S. at 569, 97 S.Ct. at 1353. We turn now to *Downum* for the reason the factual circumstances presented in that case were substantially the same as those presented in this case.

In *Downum* the defendant was charged in an eight-count indictment. The case was called for trial and both sides announced ready. After the jury was selected and sworn, but before any evidence was adduced, the prosecution discovered that "its key witness on Counts 6 and 7 was not present." 372 U.S. at 735, 83 S.Ct. at 1034.

The defendant's motion to dismiss those counts was denied and the trial judge discharged the first jury. The Court then noted that "[t]wo days later when the case was called again and a second jury impaneled, petitioner pleaded former jeopardy. His plea was overruled, a trial was had, and he was found guilty." *Id.* The Court of Appeals for the Fifth Circuit affirmed. The Court stated that "we granted the petition for certiorari because of the seeming conflict between this decision and *Cornero v. United States,* 48 F.2d 69 [1931], from the Ninth Circuit." *Id.*

Thus in *Downum,* as in this case, the "prosecution allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found." *Id.* In its resolution of the conflict between the Fifth and Ninth Circuits, the Court noted that in *Cornero,* the Ninth Circuit case, "a trial was first continued because prosecution witnesses were not present, and when they had not been found at the time the case was again called, the jury was discharged." *Id.* at 737, 83 S.Ct. at 1035. The case was called a second time, the defendant's plea of double jeopardy was denied, and the second jury found the defendant guilty as charged. The Ninth Circuit, however, reversed.

In reversing the Fifth Circuit in *Downum,* the Court concluded that "what was said in *Cornero v. United States, supra,* states the governing principle." *Id.* The Court quoted the following from the Ninth Circuit's opinion which reversed the district court's denial of the defendant's double jeopardy plea:

"The fact is that, when the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance.... The situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict. This does not take the case out of the rule with reference to former jeopardy. There is no difference in principle between a discovery by the district attorney immediately after the jury was impaneled that his evidence was insufficient and a discovery after he had called some or all of his witnesses."

*Id.* at 737, 83 S.Ct. at 1035.

The Court accordingly reversed the Fifth Circuit for the reason the Court held that the view of the Ninth Circuit was the "correct" view. *Id.* at 738, 83 S.Ct. at 1035.[36]

---

**36.** Both the Ninth Circuit in *Cornero* and the Court in *Downum* cited the early cases of *United States v. Watson,* 28 Fed.Cas. 499 (D.C.S.D.N.Y. 1846) (opinion by Judge, later Justice Blatchford) and *United States v. Shoemaker,* 27 Fed. Cas. 1067 (C.C.Ill.1840) (opinion by Justice McLean, sitting on circuit). Both cases involved the question of whether a defendant could be indicted and tried a second time after the prosecution entered a *nolle prosequi* on the indictment after a jury was sworn at a first trial. *Watson* held that the abandonment of the prosecution at the first trial "are held to be equivalent

to a verdict of not guilty, and discharging the defendants and their bail from further liability in respect of the indictment." 29 Fed.Cas. at 501. In like manner, Justice McLean concluded in *Shoemaker* that the *nolle prosequi* "must be considered equivalent to a verdict of acquittal, and, as such, with the judgment of the court thereon, is a bar to the present indictment." 27 Fed.Cas. at 1069–70.

It is thus clear that as early as 1840 a Justice of the Supreme Court recognized that particular judicial action taken at a defendant's first trial

We find and conclude that when the prosecutor in *Scott I* impaneled the jury for Scott's first trial without ascertaining whether Fortner would be present as a witness, he, as the prosecutor in *Downum*, "took a chance" for double jeopardy purposes. That chance was that if the testimony of Burns and Worlan was not sufficient to establish the requisite chain of custody, he would not be able to subject the petitioner to a second trial. We turn now to the application of the double jeopardy principles stated in the Supreme Court cases we have discussed to the factual circumstances in this case.

## VI

 Application of the Double Jeopardy Clause standards articulated in the cases we have cited and discussed to the factual circumstances of this case requires that petitioner be granted appropriate habeas corpus relief on the two separate and independent grounds. We find and conclude that the negative answers given to the two questions on which *Scott I* based its reversal of petitioner's conviction at his first trial must be considered as the equivalent of a verdict of not guilty for double jeopardy purposes and that petitioner's second trial was therefore conducted in violation of the Double Jeopardy Clause and the controlling standards most recently unanimously articulated in *Smalis*.

### A.

The first question considered in *Scott I* was "whether the state was entitled to use Burns and Worlan as witnesses after failing to disclose them in pretrial discovery." 647 S.W.2d at 605. *Scott I* answered that question in the negative. In consideration of that action for double jeopardy purposes, it must be noted that the prosecutor in Scott's first trial, like the prosecutor in *Downum*, "took a chance [when he] impaneled the jury without first ascertaining whether or not his witnesses were present." 372 U.S. at 737, 83 S.Ct. at 1035.

That prosecutor increased the double jeopardy risk when he called Burns and Worlan in open violation of Missouri Rule 25 and when he misled defense counsel during the course of the pretrial discovery. *Scott I* recognized that Burns and Worlan were called as surprise witnesses in the prosecution's attempt to bridge the "material gap in the proof" created by the absence of testimony by Fortner, the missing witness. 647 S.W.2d at 608. *Scott I* reliably found that "the crucial nature of the evidence to be supplied by witnesses Burns and Worlan is self-evident" and that "[w]ithout both witnesses, the state plainly had no case." *Id.* at 606.

The prosecutor's double jeopardy risk was further compounded by the fact that the "trial court conceded the merit of defendant's objection to use of state witnesses, Burns and Worlan, without prior disclosure" and by the fact that "the state agreed that the context of pre-trial discovery had misled the defense as to prosecution witnesses." *Id.*

The trial court, however, "gave no consideration to granting Scott's motion to bar the state from using witnesses Burns and Worlan." *Id.* Rather, in obvious recognition that the granting of Scott's motion to exclude Burns and Worlan as witnesses would necessarily require the trial court later to grant a defense motion for acquittal at the close of the prosecution's case in chief, the trial court unsuccessfully attempted to force Scott to elect to file a motion for a mistrial. Under established double jeopardy principles, most recently and unanimously approved in *Smalis*, the eventual granting of a defense motion for acquittal at the close of the prosecution's case in chief would have barred a second trial.

· For Scott's second trial obviously reflected "further proceedings ... devoted to the resolution of factual issues going to the elements of the offense charged" in Scott's first trial. 476 U.S. at 146, 106 S.Ct. at 1747. When Scott was "twice put in jeop-

must be considered as the "equivalent" of a verdict of acquittal for double jeopardy pur-

poses and that, as such, bars a second trial.

ardy ... for the same offense," the conviction obtained as a result of the further proceedings conducted at his second trial was affirmed in *Scott II* when that court refused to recognize the evidentiary insufficiency findings made in *Scott I* upon which that court reversed Scott's initial conviction.

*Scott I* reliably found that "defense counsel informed the court that Scott did not seek a mistrial" and that he wanted "to pursue the trial then in progress in the hope of a favorable verdict." *Id.* at 606. *Scott I* accurately stated that "Scott did not seek and his cause was not furthered by a mistrial which, of course, would have aided the state in providing added time to locate the evidence witness, Fortner." *Id.* at 606–07.

The "solution" offered Scott by the trial court was the "Hobson's choice" [37] to choose between "a mistrial declared sua sponte by the court or an opportunity to interview Burns and Worlan before they testified." *Id.* at 606. Neither alternative would have solved the double jeopardy problem created by the prosecutor's willingness to run the risk of commencing Scott's first trial without having Fortner available as a witness.

For the impact of the Double Jeopardy Clause would not have been avoided had the trial court carried out its threat to declare a mistrial sua sponte. *Green v. United States,* 355 U.S. 184, 188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957), made clear over thirty years ago that had the trial court in Scott's first trial declared a mistrial sua sponte without Scott's consent, the Double Jeopardy Clause would have barred a second trial. *Green* held that:

> This Court, as well as most others, has taken the position that a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged *without his consent* he cannot be tried again. *Wade v. Hunter,* 336

U.S. 684 [69 S.Ct. 834, 93 L.Ed. 974 (1949)]; *Kepner v. United States,* 195 U.S. 100, 128 [24 S.Ct. 797, ——]. In general see American Law Institute, Administration of The Criminal Law: Double Jeopardy 61–72 (1935). This prevents a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict.

*Id.* at 188, 78 S.Ct. at 223 (Emphasis added).

The Eighth Circuit stated the same rule as follows in *United States v. Beran,* 546 F.2d 1316, 1319 n. 2 (8th Cir.1976):

> While the trial court may order a mistrial on its own motion, its power to do so is limited by the double jeopardy clause of the Fifth Amendment. Only if there is an "imperious" or "manifest necessity" for doing so will the ordering of a mistrial come within the recognized exceptions to the double jeopardy provision. *See Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824).

Certainly, it cannot be said that the circumstances reliably found in *Scott I* presented an "imperious" or "manifest necessity" under the *Perez* rule for the trial court to have exercised its limited power to declare a mistrial on its own motion.

The only way the impact of the Double Jeopardy Clause could have been avoided under the circumstances of Scott's first trial would have been the granting of a motion for mistrial voluntarily and deliberately filed by Scott.[38] *Scott I* reliably found that Scott did not want a mistrial; Scott made clear to the trial court that he wanted to "pursue the trial then in progress in the hope of a favorable verdict." 647 S.W.2d at 606.

37. *United States v. Dinitz,* 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976).

38. *See United States v. Scott,* 437 U.S. 82, 98–99, 98 S.Ct. 2187, 2197–98, 57 L.Ed.2d 65 (1978) (a defendant who deliberately chooses "to seek termination of the proceedings against him on a basis unrelated to factual guilt or innocence of the offense of which he is accused, suffers no injury cognizable under the Double Jeopardy Clause....").

*Scott I* properly concluded that the trial court's "solution" to the obvious double jeopardy problem created by the prosecutor's willingness to take a chance was no solution at all. *Scott I* therefore properly reversed the conviction on the separate and independent ground that the trial court's failure "to sustain the defendant's motion to exclude witnesses Burns and Worlan" was the only way that "the prejudice to Scott's due process [could] be effectively removed." *Id.* at 607.

We find and conclude that under the circumstances of this case, the first ground on which Scott's conviction was reversed must be considered as the equivalent of a verdict of not guilty and that Scott's second trial was conducted in violation of the Double Jeopardy Clause.

### B.

The second question presented in *Scott I* was "whether the proof from these witnesses [Burns and Worlan] was sufficient to establish the integrity of the physical evidence." *Id.* at 605. The "physical evidence" was the "scrap of cardboard from which [Scott's] fingerprint had allegedly been recovered." *Id.* at 604. The second question presented on appeal was whether the prosecution had adduced sufficient evidence to establish the "requisite proof" that the fingerprint "exhibit was in fact an article collected at the crime scene." *Id.* at 608. *Scott I* answered that question in the negative.

Consideration of *Scott I*'s answer for double jeopardy purposes requires an analysis of the rationale on which that negative answer was based. In its description of the "hypothesis of the prosecution" *Scott I* stated that "Scott's implication in the crime rested entirely on a fingerprint comparison." *Id.* at 604. And in stating the "particular importance" of the fingerprint exhibit, *Scott I* concluded that "upon that exhibit alone depended the entitlement of the state to take the case to the jury."

*Id.* at 608. *Scott I* concluded that the "absence of testimony by Fortner left a material gap in the proof necessary to show with reasonable assurance the exhibit was in fact an article collected at the crime scene." *Id.* at 608.

That decision based on *Scott I*'s finding that the testimony of Burns "established only that some evidence similar in appearance to the piece of cardboard from which the fingerprint had been obtained was gathered by officer Fortner along with other objects and placed in an evidence bag." *Id.* at 607. *Scott I* expressly found that "Burns could not and did not attempt to state that the exhibit offered in evidence was one of the items Fortner had retrieved." *Id.*

In regard to Worlan's testimony, *Scott I* found that "[w]hile Worlan did identify Fortner's initials on the evidence bag, he had no knowledge as to the source of the contents and he was unable to explain why the evidence bag was twice delivered to the crime laboratory." *Id.* And in regard to Fortner's written report admitted in evidence as a business record at Scott's first trial, *Scott I* stated that "[s]ignificantly, the report and Fortner's narrative described in detail the evidence recovered at the crime scene, including the gloves and pieces of duct tape used to bind the victims but neither document made any mention whatever of a duct tape box or a piece of cardboard." [39] *Id.* at 607.

The failure of proof that *Scott I* found was present under the circumstances of Scott's first trial was obviously different from the failure of proof presented under the circumstances of *Burks*. The factual differences in the two cases, however, do not provide a basis for distinguishing one from the other. *Burks* held that the Double Jeopardy Clause barred a second trial for the reason the appellate court's evidentiary insufficiency reversal was based on its finding that "the prosecution's evidence

---

**39.** In further regard to Fortner's written report, *Scott I* also stated that "the necessity for Fortner's testimony is underscored by the glaring omission in his official report of any mention of the exhibit" and added that "there was no proof at all that the exhibit was preserved intact from March 30, the date of the crime, until April 16 when Worlan made his examination." *Id.* at 608.

with respect to Burks' mental condition, even when viewed in the light most favorable to the Government, did not 'effectively rebu[t]' petitioner's proof with respect to insanity and criminal responsibility." 437 U.S. at 4, 98 S.Ct. at 2143.

*Scott I*'s appellate evidentiary insufficiency reversal was based on its finding that the testimony of the witnesses Burns and Worlan, when viewed in the light most favorable to the prosecution, simply was not sufficient to establish that the piece of cardboard from which Scott's fingerprints were lifted was "in fact an article collected at the crime scene." 647 S.W.2d at 608.[40] Accordingly, the jeopardy principles stated in *Burks* are applicable to this case. For it is clear that the second ground upon which *Scott I*'s appellate reversal was based was that court's definitive finding that the prosecution had failed to adduce sufficient evidence to establish the requisite proof that would permit the jury to consider the single item of evidence that would have permitted "the state to take the case to the jury." 647 S.W.2d at 608.

Under all of the evidence adduced at the first trial, as *Scott I* viewed it, the prosecution was able to get the fingerprint exhibit in evidence without adducing sufficient evidence that the piece of cardboard from which the fingerprint had been obtained was, in fact, an item that Fortner had retrieved at the scene of the crime. In short, *Scott I* concluded that the fact that one of Scott's fingerprints was admitted in evidence, standing alone, was not sufficient to support a verdict of guilty.

*Burks* established the principle that it is immaterial for double jeopardy purposes that an appellate court, rather than a trial court, determines the evidence to be insufficient to support a jury verdict of guilty. It is unquestionably true in this case, as it was in *Burks*, that *Scott I*'s appellate decision "represente[d] a resolution, correct or not, of some or all of the factual elements charged" within the meaning of the *Martin*

*Linen* standard approved in *Smalis*, 437 U.S. at 10, 98 S.Ct. at 2146. *Burks* concluded that such an "appellate decision unmistakenly meant that the District Court had erred in failing to grant a judgment of acquittal." 437 U.S. at 11, 98 S.Ct. at 2147. Application of the principles stated in *Burks* requires that we find and conclude that the Double Jeopardy Clause barred Scott's second trial.

Any doubt that *Martin Linen*'s standard must be applied to this case was removed by the Court's recent opinion in *Arizona v. Rumsey*, 467 U.S. 203, 211, 104 S.Ct. 2305, 2310, 81 L.Ed.2d 164 (1984). In that case there was no question that the court's evidentiary insufficiency finding was based on that court's misconstruction of a statute. The Court, however, held that:

> Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits. "[T]he fact that 'the acquittal may result from erroneous evidentiary rulings or erroneous interpretations of governing legal principles' ... affects the accuracy of that determination, but it does not alter its essential character." *United States v. Scott*, 437 U.S. 82, 98 [98 S.Ct. 2187, 2197, 57 L.Ed. 2d 65 (1978) (quoting *id.*, at 106, [98 S.Ct. at 2201] (Brennan, J., dissenting)). Thus, this Court's cases hold that an acquittal on the merits bars retrial even if based on legal error.

*Scott I*'s reversal must be considered for double jeopardy purposes as a "judgment that amounts to an acquittal on the merits." *Id.* at 211, 104 S.Ct. at 2310. We therefore further find and conclude that the prosecution at Scott's first trial, having "been given one fair opportunity to offer whatever proof it could assemble" (437 U.S. at 16, 98 S.Ct. at 2150) was barred by the Double Jeopardy Clause from having "the proverbial 'second bite at the apple.'" *Id.* at 17, 98 S.Ct. at 2150. Accordingly, an order will be entered granting petitioner

---

**40.** Both *Burks* and *Scott I* considered all of the legally competent evidence adduced by the prosecution in making their respective evidentiary insufficiency findings. Thus neither case presented the question left open in *Greene v. Massey*, 437 U.S. 19, 26 n. 9, 98 S.Ct. 2151, 2155 n. 9, 57 L.Ed.2d 15 (1978).

appropriate habeas corpus relief on the first ground alleged in his petition.

## VII

Petitioner alleged six additional grounds for federal habeas corpus relief. All those grounds, however, were based on claims that related to petitioner's second trial and to the Missouri Rule 27.26 proceeding conducted in regard to the second trial. Our grant of habeas corpus on the double jeopardy ground alleged as the first ground of the petition moots all remaining questions and need not be discussed.

It is appropriate to state, however, that petitioner, in what must be considered as his brief on the merits, presented another double jeopardy contention which we considered but determined to be untenable in light of the limitations placed on the earlier standard stated in *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), by the Court's more recent divided opinion in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Petitioner argued on page 6 of his "brief" that:

> There is an additional basis for holding the trial court and appeal court errored and subjected petitioner to double jeopardy ... [P]etitioner contends that at lest [sic] in some circumstances the double jeopardy clause may preclude retrial after a reversal for judge and prosecutorial misconduct or overreaching ... In support of this proposition, the petitioner urges that this court look to the law governing mistrials that are triggered by prosecutorial or judge overreaching. In such cases the double jeopardy clause ... bars retrial where "bad faith conduct by judge or prosecutor" so as to afford the prosecutor a more favorable opportunity to convict the defendant. (See *Downum v. U.S.*, [372 U.S. 734, 83 S.Ct. 1033] 10 L.Ed.2d 100); *United States v.*

*Kesler*, 530 F.2d 1246 (5th Cir. [1976]); *United States v. Wilson*, 534 F.2d 76 [6th Cir.1976]; *Petrucelli v. Smith*, 544 F.Supp. 627 [D.N.Y.1982].

Brief at 6.

We must reject petitioner's overreaching argument for the reason that *Downum* has not generally been considered to be an overreaching case [41] and for the reason that *Kesler* and *Wilson* were decided before *Kennedy*. *Kesler* and *Wilson* therefore did not consider the impact of the limitation placed on standards stated in *Dinitz* by *Kennedy*.

The Court recognized in *Kennedy* that the controlling standards to be applied in an overreaching case "have been stated with less than crystal clarity in our cases which deal with this area of the law." 456 U.S. at 674, 102 S.Ct. at 2088. Indeed, the Court candidly stated that in "adopting the position we now do, we recognize that language taken from our earlier opinions may well suggest a broader rule." *Id.* at 677–78, 102 S.Ct. at 2090.

*Kennedy*, of course, adopted a more narrow rule. For the new standard articulated in that case that must be currently applied is that "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial *absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.*" *Id.* at 675–76, 102 S.Ct. at 2089 [42] (Emphasis added).

*Petrucelli*, the only post-*Kennedy* case cited by petitioner, vividly illustrates the impact of *Kennedy*'s new test. For in Chief Judge Curtin's first opinion in that case, which was cited by petitioner, he made a tentative finding that "the prosecutor's deliberate indefensible conduct throughout Petrucelli's first trial compels" the application of the Double Jeopardy

---

41. W. LaFave and J. Israel, *Criminal Procedure*, do not cite *Downum* in their § 24(c), at 76, in which the "Prosecutorial or Judicial Overreaching" cases are cited and discussed.

42. The Court later added that "[o]nly where the governmental conduct in question is *intended* to

'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676, 102 S.Ct. at 2089. (Emphasis added).

Clause. 544 F.Supp. at 639. Chief Judge Curtin concluded, however, that under *Kennedy* the state "should have an opportunity to present any evidence he may have that the prosecutor did not, as a matter of fact, intend to provoke Petrucelli's mistrial motions." *Id.* at 639.

After conducting an evidentiary hearing, Chief Judge Curtin concluded in a second opinion (that petitioner did not cite) that under the evidence adduced at that hearing he could not make a finding that the prosecutor had *intentionally* attempted to provoke a mistrial, as required by *Kennedy*'s new standard. *Petrucelli v. Coombe,* 569 F.Supp. 1523, 1524 (W.D.N.Y.1983). *Petrucelli II* therefore concluded that the "facts do not warrant a double jeopardy bar of Petrucelli's second trial." *Id.* Chief Judge Curtin accordingly vacated and set aside the conditional grant of habeas corpus relief made in *Petrucelli. See* 569 F.Supp. at 1526.[43]

Under the factual circumstances as stated in *Scott I,* it is apparent that it was not until after Burns, the prosecution's first surprise witness, had testified, was it "disclosed that Fortner, the evidence technician, could not be located." 647 S.W.2d at 604. That "objective" circumstance, *see* Justice Powell's concurring opinion in *Kennedy,* 456 U.S. at 679, 102 S.Ct. at 2091, however, cannot be said to support a finding that the prosecutor acted "intentionally" within the meaning of *Kennedy*'s new rule.

■ For *Scott I,* at least implicitly, found that the prosecutor had acted "unintentionally." *Scott I* stated, with apparent approval, that "defense counsel had been *unintentionally* misled as to the witnesses who would be added." 647 S.W.2d at 606. Because we are satisfied that we are required to accept *Scott I*'s implicit finding, we conclude that under the new *Kennedy* standard, petitioner's prosecutorial or judicial overreaching claim is not tenable.

**VIII**

For the reasons stated, we find and conclude that petitioner is entitled to habeas corpus relief on the first ground alleged in his petition. Accordingly, and in the exercise of the power and jurisdiction conferred on this Court by 28 U.S.C. §§ 2243 and 2254, it is

ORDERED (1) that petitioner is entitled to the habeas corpus relief prayed for in his petition for the reason the judgment and sentence imposed by the Circuit Court of Jackson County, Missouri on December 23, 1983 (Exh. B at 24), affirmed by the Missouri Court of Appeals, Western District, in *State v. Scott,* 699 S.W.2d 760 (Mo.App.1985), under which petitioner is being held in custody by the respondent was obtained at a second trial conducted in violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States. It is further

ORDERED (2) that the Clerk shall, pursuant to Rule 58 of the Federal Rules of Civil Procedure, enter judgment on a separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure for the petitioner and against the respondent in accordance with Order (1). It is further

ORDERED (3) that on or before Friday, June 10, 1988, the Attorney General shall prepare, serve, and file a response to this order in which he will state the manner in which the respondent will have complied with the order and judgment entered in this case.

ARLESTER E. SCOTT, Petitioner,

v.

JIM JONES and WILLIAM L. WEBSTER, Respondents.

No. 88-0183-CV-W-JWO

MEMORANDUM AND ORDER DENYING RESPONDENTS' RULE 23(c) APPLICATION FOR STAY

**I.**

On June 7, 1988, in response to this Court's Order (3) entered on June 3, 1988,

---

**43.** The Second Circuit refused to consider the merits of the difficult question presented in the *Petrucelli* cases on *Rose v. Lundy* exhaustion grounds. *See* 735 F.2d 684 (2d Cir.1984). Petitioner, whose facilities for legal research are obviously limited, did not cite the second District Court opinion or the Second Circuit decision in that case in the brief filed in this Court.

respondent filed an "Application for Stay of Execution of Writ of Habeas Corpus." That pleading stated that "respondent prays this Court will interpret the present application for stay, as Respondent's statement of his intent to proceed in accordance with the court's order." Doc. #10 at 1. Respondent's application also stated that respondent intended to appeal this Court's order granting habeas corpus relief entered June 3, 1988, and that respondent "will file a notice of appeal promptly with this Court." *Id.* at 1–2.

On June 10, 1988, respondent did file a notice of appeal. Because respondent quoted Federal Rule of Appellate Procedure 23(c) and cited *Hilton v. Braunskill*, — U.S. ——, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), in his June 7, 1988, application, we will treat respondent's June 7, 1988, filing as a Rule 23(c) application for a stay pending appeal.[1]

On June 13, 1988, petitioner filed formal suggestions in opposition to respondent's June 7, 1988, application. On the same day we received a letter from the petitioner which supplemented those formal suggestions. Petitioner's filings establish that petitioner also cites and relies on the Rule 23(c) standard articulated in *Braunskill*.

Application of the Rule 23(c) standard stated in *Braunskill* requires that we find and conclude that respondent's application should be denied for the reasons we shall state in some detail. Appropriate orders will be entered pursuant to Rule 23(c) that enlarge petitioner upon his own recognizance.

We will, however, enter a further order that will stay the execution of this court's final judgment granting habeas corpus relief and the orders entered today for a

reasonable period of time in order to afford respondent an opportunity to show the Court of Appeals any requisite special reasons pursuant to Federal Rule of Appellate Procedure 23(d) why this court's order denying a Rule 23(c) stay should be modified or why an independent order respecting petitioner's custody, enlargement, or surety should be entered by the Court of Appeals.[2]

## II.

In *Braunskill* the Court was "asked to decide what factors these provisions [Fed. R.App.P. 23(c) and 23(d)] allow a court to consider in determining whether to release a state prisoner pending appeal of a district court order granting habeas relief." 107 S.Ct. at 2117. That inquiry was prompted by the reliance of the district court and the Court of Appeals on the Third Circuit's earlier decision in *Carter v. Rafferty*, 781 F.2d 993, 997 (3d Cir.1986), which held that "federal courts deciding whether to release a successful habeas petitioner pending appeal may consider the petitioner's risk of flight, but not his danger to the community." *Id.*

The Court vacated the judgment of the Court of Appeals denying the State's application for a stay pending appeal and remanded the case to the Court of Appeals for further consideration for the reason "the District Court and the Court of Appeals, in relying on the latter's decision in *Carter v. Rafferty, supra,* took too limited a view of the discretion allowed to federal courts under Rule 23(c) and (d) in staying pending appeal an order directing the release of a habeas petitioner." *Id.* 107 S.Ct.

---

1. Rule 23(c) provides in full:

 (c) *Release of prisoner pending review of decision ordering release.*—Pending review of a decision ordering the release of a prisoner in such a proceeding, the prisoner shall be enlarged upon the prisoner's recognizance, with or without surety, unless the court or justice or judge rendering the decision, or the court of appeals or the Supreme Court, or a judge or justice of either court shall otherwise order.

2. Rule 23(d) provides in full that:

 (d) *Modification of initial order respecting custody.*—An initial order respecting the custody or enlargement of the prisoner and any recognizance or surety taken, shall govern review in the court of appeals and in the Supreme Court unless for special reasons shown to the court of appeals or to the Supreme Court, or to a judge or justice of either court, the order shall be modified, or an independent order respecting custody, enlargement or surety shall be made.

at 2120.[3]

The Court commenced its analysis of the factors to be considered in the exercise of the discretion vested by Rules 23(c) and (d) by recognizing that:

> Rule 23(c) undoubtedly creates a presumption of release from custody in such cases, but that presumption may be overcome if the judge rendering the decision, or an appellate court or judge, "otherwise orders." Rule 23(d) creates a presumption of correctness for the order of a district court entered pursuant to Rule 23(c), whether that order enlarges the petitioner or refuses to enlarge him, but this presumption may be overcome in the appellate court "for special reasons shown." (Footnote omitted.)[4]

*Id.* at 2118.

For the guidance of both the district courts and the courts of appeals, *Braunskill* concluded that "the general standards governing stays of civil judgments should also guide courts when they must decide whether to release a habeas petitioner pending the state's appeal; and such a conclusion is quite consistent with the general language contained in Rule 23(c) and (d)."[5] *Id.* at 2119. And for the specific guidance of the district courts, the Court concluded that "we think that a court making an initial custody determination under Rule 23(c) should be guided not only by the language of the Rule itself but by the factors traditionally considered in deciding

whether to stay a judgment in a civil case." *Id.* at 2119.

The Court stated that Federal Rule of Civil Procedure 62(c) and Federal Rule of Appellate Procedure 8(a) "govern the power of the district courts and the courts of appeals to stay an order pending appeal" and added that "the factors regulating the issuance of a stay are generally the same: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[6] *Id.*

*Braunskill* noted, however, that, "Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules." *Id.* Indeed, the Court concluded that still additional factors should be considered in determining whether a Rule 23(c) stay should be granted in a habeas corpus case.

The Court concluded that the following additional factors should be considered in ruling a Rule 23(c) motion for a stay: (5) "the possibility of flight"; (6) whether "the prisoner will pose a danger to the public if released"; and (7) the "state's interest in continuing custody and rehabilitation pending a final determination of the case on appeal."[7] *Id.*

3. The Court made clear that, "[w]e do not believe that federal courts, in deciding whether to stay pending appeal a district court order granting relief to a habeas petitioner, are as restricted as the *Carter* court thought." *Id.* at 2117–18.

4. Later in its opinion, the Court recognized the presumption established by Rule 23(c) by stating that under the standards stated in *Braunskill:* "There is presumption in favor of enlargement of the petitioner with or without surety, but it may be overcome if the traditional stay factors tip the balance against it." *Id.* at 2119.

5. Later in its opinion in *Braunskill,* the Court reiterated that "[u]ntil the final determination of the petitioner's habeas claim, federal courts must decide applications for stay of release using factors similar to those used in deciding whether to stay other federal court judgments." *Id.* at 2120.

6. In addition to citing the familiar cases applying Rule 62(c) and Rule 8, the Court also cited 11 C. Wright and A. Miller, *Federal Practice and Procedure,* § 2904 (1973), to support its statement of the four traditional factors to be considered. This Court's decisions in *Environment Defense Fund, Inc. v. Froehlke,* 348 F.Supp. 338, 366 (W.D.Mo.1972), and *Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n.,* 409 F.Supp. 233 (W.D.Mo.1976), were cited with approval in footnotes 37 and 39 (pocket part), respectively, of *Federal Practice and Procedure,* § 2904. This Court has, of course, considered and applied the traditional standards in many other cases over the years.

7. The Court added that the state's interest in custody "will be strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence to be served." *Id.* Such a factor would be rele-

The Court made clear that the three special habeas corpus factors stated in *Braunskill* and the four traditional factors applicable to civil cases must all be given appropriate consideration in determining whether a stay pending appeal in a habeas corpus case should be granted. The Court concluded that the "interest of the habeas petitioner in release pending appeal, always substantial, will be strongest where the factors mentioned in the preceding paragraph are weakest." *Id.* The Court then added that:

> The balance may depend to a large extent upon determination of the state's prospects of success in its appeal. Where the state establishes that it has a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits, continued custody is permissible if the second and fourth factors in the traditional stay analysis militate against release. [Citing cases.] Where the state's showing on the merits falls below this level, the preference for release should control.

*Id.*, 107 S.Ct. at 2119–20.

■ Although there is a substantial factual and procedural difference between a case in which an order granting an unconditional release is entered and a case like *Braunskill* in which an order granting only a conditional release was entered,[8] we are satisfied that the standards stated in *Braunskill* are to be applied in both types of cases. The burden of overcoming the presumption of release from custody undoubtedly created by Rule 23(c) and of establishing appropriate grounds why a

district court should "otherwise order," of course, rests upon the State.

The standards stated in *Braunskill* will be applied to the factual circumstances of this case in the next part of this opinion.

## III.

### A.

Respondent's application accurately quoted Rule 23(c) to support the statement that this Court "has the power to stay petitioner's release, pending respondent's appeal of this action." Doc. # 10 at 2. Respondent, citing *Braunskill*, however, inaccurately stated that the "Supreme Court has stated that a federal court, in deciding whether to release a successful habeas petitioner under Rule 23(c), should take into account *three* factors." (Emphasis added.) Respondent argued that this Court, after consideration of only the three habeas corpus factors stated in *Braunskill*, should "exercise its discretion and stay the execution of petitioner's petition for writ of habeas corpus."

Respondent's application failed to even so much as mention the four traditional civil case factors that *Braunskill* concluded must also be given consideration in determining whether a Rule 23(c) stay should or should not be granted. While respondent's application could be denied for failure to discuss all seven of the applicable factors stated in *Braunskill*, we believe it necessary that this Court state its view of all seven of the factors stated in that case.

We will first discuss the three habeas corpus factors listed in respondent's application[9] and then discuss the four tradition-

vant in the case of an order granting a conditional release from custody, the situation presented in *Braunskill*.

It is doubtful, however, whether the length of sentence served should be given much weight in a case such as this case in which an order of unconditional release has been entered. *See Walberg v. Israel*, 776 F.2d 134, 136 (7th Cir. 1985), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985) ("If a determination is made that ... the applicant ... is entitled to his unconditional release, he ought to be left at large until and unless the order to release him is reversed by a higher court.").

8. *Walberg v. Israel, supra* at 136, we believe correctly pointed out that in a case in which an order for a conditional release is entered, "the presumption in Rule 23(c) can easily be rebutted by showing that the state is quite likely to be able to retry, reconvict, and reimprison the applicant, and that therefore he should not be released, the error in his existing incarceration being readily curable."

9. Respondent's factual contentions, such as they are, are stated on page 3 of the application for a stay. Respondent's Motion Exhibit 1, a printout of petitioner's Missouri criminal history, is the

al factors included in *Braunskill's* standard.

## B.

### The Possibility of Flight

Respondent does not even contend that the possibility of flight factor should be weighed against Rule 23(c)'s presumption of release from custody pending appeal.

Exhibits A, B, and C attached to petitioner's brief in opposition establish that petitioner was released on bond before both his first trial and before his second trial, and that petitioner appeared for both trials in accordance with the conditions of those bonds. Further discussion of the possibility of flight factor would be redundant. For no weight can properly be accorded a factor that respondent does not even claim is present.

### Risk of Danger to the Public if Petitioner is Released

Respondent contends that it "is clear petitioner poses a risk to society if he is released." Doc. # 10 at 3. That contention is based on the argument that petitioner "was convicted of robbery and armed criminal action, which crimes involve the use of a dangerous weapon." [10] *Id.* Respondent attached a copy of a printout of petitioner's Missouri criminal history as his Motion Exhibit 1 and argued that "petitioner's current conviction is only the latest in a history of convictions on felony charges including robbery and stealing," and that, thus, "this Court can infer that petitioner will pose *some* danger to the public if released." *Id.* (Emphasis added.) [11]

only documentary evidence presented in support of respondent's application for stay.

10. The fact that respondent inaccurately stated that petitioner was convicted of "armed criminal action" as well as "robbery" is not of any significance. Both *Scott I* and *Scott II* accurately state that petitioner was convicted only on a Robbery I charge.

11. That exhibit, although difficult to read and understand, can be said to support respondent's general description of the history of petitioner's past convictions.

12. Petitioner's criminal history, like the criminal histories in all but a highly exceptional case,

We agree that the release of the petitioner will, as respondent suggests, pose *some* danger to the public. The question, of course, is how much weight should be given that factor. It would seem obvious that controlling weight may not properly be given that single factor. For experience establishes that twenty-five year sentences are rarely imposed on a prisoner who has an unblemished criminal record.

Petitioner's criminal history in this case is quite typical of the criminal histories this court has observed in substantially all of the numerous habeas corpus cases it has processed over the past twenty-five years. It would indeed be an exceptionally rare case in which a twenty-five year sentence is imposed on a particular defendant's first conviction.[12]

We are thus satisfied that controlling weight may not properly be given the second habeas corpus factor under discussion. For to do so would violate *Braunskill's* admonition that "the formula cannot be reduced to a set of rigid rules." *Id.* at 2119.

We believe that this is particularly true under the circumstances of this case. For petitioner's first conviction was reversed on evidentiary insufficiency grounds and his second conviction was, under our view of the applicable law, obtained in a trial that was barred by the Double Jeopardy Clause.

### The State's Interest in Continuing Custody and Rehabilitation

Respondent contends that "the state has a continuing interest in the custody of peti-

reflects petitioner's first arrest was for burglary and stealing (but no conviction) when he was 18 years old; a 45 day jail sentence for stealing when he was 19 years old; then another 60 day and 45 day jail sentence for stealing and robbery later in the same year; and petitioner's first 5 year penitentiary sentence on a guilty plea to robbery I which he began to serve June 7, 1967. In 1977 petitioner received another 5 year penitentiary sentence for illegal possession of drugs. Petitioner's history shows that he commenced service of the 25 year sentence imposed after petitioner's second trial on January 1, 1984.

tioner," and that pending "review of this Court's action, this Court should recognize the state's high interest in incarcerating petitioner and continuing his rehabilitation." [13] Doc. # 10 at 3.

The State's professed interest in continuing the petitioner's "rehabilitation" is entitled to little weight. For the State's past efforts in regard to the rehabilitation of the petitioner have been quite unsuccessful. It is obvious that the State is primarily interested in continuing petitioner's incarceration pending the appeal of a conviction that this court has concluded to be invalid under the Constitution of the United States.

Respondent, other than the citation of *Braunskill,* cites no other cases in support of its application. Petitioner, on the other hand, relies on *Rado v. Manson,* 435 F.Supp. 349 (S.D.Conn.1977), and *United States v. Smith,* 200 F.Supp. 885 (D.Vt. 1962). *Rado* involved a different procedural situation than this case (petitioner was released on bail pending the final determination of the merits of his federal habeas corpus petition). *United States v. Smith,* however, presented substantially the same procedural situation presented in this case.[14] Judge Timbers, in his discussion of the interest of Vermont in maintaining custody of a petitioner pending an appeal from an order granting habeas corpus, stated that, "Surely Vermont 'has no interest in maintaining an unconstitutional conviction and every interest in preserving the writ of habeas corpus to nullify them when they occur,' " 200 F.Supp. at 934 (quoting Justice Jackson's opinion in *Brown v. Allen,* 344 U.S. 443, 548, 73 S.Ct. 397, 430, 97 L.Ed. 469 (1952)). Judge Timbers also quoted the following from Justice Jackson's *Brown v. Allen* opinion: " 'If a state is really obtaining conviction by laws or procedures which violate the Federal Constitution, it is always a serious wrong, not only to a particular convict, but to federal law.' " *Id.* n. 343. Judge Timbers then added, "Depriving a man of basic constitutional rights is offensive, not only to federal law and to the Constitution of the United States: it offends the people of Vermont." [15]

Judge Timbers entered orders (1) denying "respondent's motion for a stay of judgment pending appeal" and (2) granting "petitioner's motion to be admitted to bail." *Id.* at 943. We agree with the rationale upon which those orders were based.

We are thus satisfied that but slight weight may properly be given the habeas corpus factor of the State's interest in continuing custody pending appeal. For the State in this case has presented no factual data whatever to support its conclusory argument that "the State has a continuing interest in the custody of petitioner" and a "high interest in incarcerating petitioner."

---

**13.** Respondent also contended that petitioner "has completed only a little over four years of a twenty-five year sentence." *Id.* The judgment entered after the second trial (Exhibit B, p. 24) shows petitioner was credited with "one and one-half years for time served in federal custody." An exhibit attached to petitioner's June 10, 1988, letter to this court shows that he commenced his second sentence on January 16, 1984, and that he was credited with "Jail Time: 905 days." While we agree with petitioner that he has, as a practical matter, been in custody as a result of the offense a substantially longer period of time than that stated in the respondent's application, we are satisfied that the remaining length of a particular sentence is to be accorded substantial weight only in a case involving a conditional release, as distinguished from an unconditional discharge for the reasons we have stated above.

**14.** The orders entered in that case by Judge William H. Timbers are entitled to appropriate consideration even though his order granting habeas corpus relief was reversed on the merits by the Second Circuit in 306 F.2d 596 (2d Cir. 1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963). For Judge Timbers' order admitting the petitioner to bond pending appeal remained in effect until the Second Circuit decided the merits of that appeal. Judge Timbers, then a District Judge in the District of Connecticut, sat by designation in the District of Vermont, became a Circuit Judge for the Second Circuit in 1971, and presently serves as a Senior Circuit Judge.

**15.** Earlier in his opinion Judge Timbers expressed the same thought when he stated, "As Mr. Justice Harlan has tersely put it, 'The proponent before the Court is not the petitioner but the Constitution of the United States.' " *Id.* at 933 (footnote omitted) (quoting from *Chessman v. Teets,* 354 U.S. 156, 165, 77 S.Ct. 1127, 1132, 1 L.Ed.2d 1253 (1957)).

There may, of course, be cases that may present unique factual circumstances that could be said to overcome Rule 23(c)'s presumption in favor of release pending appeal. This, however, is not such a case. For respondent has not even attempted to make any factual showing to carry the burden of overcoming that presumption.

We turn now to the four traditional factors that must be given appropriate consideration in determining whether to enter orders releasing petitioner pending appeal.

## C.

Respondent failed to recognize and therefore did not discuss the four traditional stay factors stated in *Braunskill* that a district court must consider in ruling a Rule 23(c) application for a stay in a habeas corpus case. Consideration of those factors in this case must therefore be made on the basis of the files and records in this case.

### *Respondent's Likelihood of Success on the Merits*

The question of "whether the stay applicant has made a strong showing that he is likely to succeed on the merits," 107 S.Ct. at 2119, must be determined by the showing made by respondent in response to the claims made by the petitioner in his petition for habeas corpus. Petitioner's double jeopardy claim was stated as his first ground for habeas corpus relief in the first six pages of the supplemental pages attached to his petition. Petitioner cited and relied upon *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *Cornero v. United States*, 48 F.2d 69 (9th Cir.1931); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976); *United States v. Wilson*, 534 F.2d 76 (6th Cir.1976); and *Petrucelli v. Smith*, 544 F.Supp. 627 (W.D.N.Y.1982). All of those cases, together with a number of other Supreme Court cases, were discussed in our opinion granting habeas corpus relief.

Respondent's argument on the merits in opposition to petitioner's double jeopardy claim was stated in a single paragraph of respondent's response to this court's order to show cause why a writ of habeas corpus should not be granted. Doc. #5 at 7. After making a short summary of petitioner's double jeopardy claim, respondent stated on page 7 of the response that:

> Petitioner's claim is without merit. The Double Jeopardy Clause of the Fifth Amendment does not bar retrial when an earlier conviction was reversed on the basis of trial error. *See, Burks v. United States*, 437 U.S. 1, 14, 98 S.Ct. 2141 [2148], 57 L.Ed.2d 1 (1978); *United States v. Ball*, 163 U.S. 662, 672, 16 S.Ct. 1192 [1195], 41 L.Ed. 300 (1896). Petitioner cannot claim the protection of the Double Jeopardy Clause in this instance. This Court should find petitioner's first point lacks merit.

That single paragraph reflects the complete extent of the showing made by respondent in this Court in opposition to the first ground of petitioner's habeas corpus petition. Even if consideration be given the respondent's successful, but in our view untenable, argument made and accepted by the Missouri Court of Appeals in *Scott II* (our discussion of which commenced on page 518 of our June 3, 1988, opinion), it is our considered judgment that respondent has failed to carry the burden of making a strong showing that he is likely to succeed on the merits of his appeal.

### *Respondent's Irreparable Injury Absent a Stay*

There is no apparent reason as to why respondent would "be irreparably injured absent a stay." 107 S.Ct. at 2119. For under the order to be entered by this Court, petitioner will be "enlarged upon his own recognizance ... pending review of [this Court's] decision ordering the [petitioner's unconditional] release" from respondent's custody. If this Court's order granting habeas corpus is affirmed by the Court of Appeals, respondent will not have been injured at all. For appellate affirm-

ance of this Court's order will necessarily mean that respondent never should have been in custody under the sentence imposed at petitioner's second trial.

If, on the other hand, this Court's order is reversed on appeal, petitioner's enlargement to constructive federal custody would promptly be revoked and petitioner would be returned to respondent's custody. The fact that petitioner will be enlarged upon his own recognizance for the relatively short period of time pending appeal cannot be said to constitute an irreparable injury to respondent. For the time petitioner is in constructive federal custody pending appeal would have to be served should this Court's order of release be reversed.[16]

It is accordingly our view that little, if any, weight may properly be given the second traditional factor stated in *Braunskill.*

### Injury to Petitioner Should a Stay be Issued

The question of "whether the issuance of the stay will substantially injure [petitioner, as the other party] interested in the proceeding," 107 S.Ct. at 2119, must be answered in the affirmative. Judge Timbers stated the obvious when he denied the State's motion for stay of judgment in *United States v. Smith.* He first noted that petitioner "has been incarcerated for more than two and one half years, two of which have been pursuant to a void judgment." 200 F.Supp. at 942. He then stated that if the petitioner "ultimately wins his freedom" after appellate review, he will have been required to spend still more time "in jail without justification." *Id.* Judge Timbers concluded that, "[s]uch a result would only compound the miscarriage of justice which this Court has found already has been inflicted on him," and that to "delay discharge of petitioner pending appellate review, under all the circumstances and particularly in view of this Court's

findings of fact and conclusions of law embodied in its memorandum of decision of December 22, 1961, would appear to raise a grave question whether the fundamental objective of habeas corpus would not thereby be defeated." *Id.* at 942–43. We agree.

The third traditional factor must accordingly be weighed in favor of the petitioner.

### Where the Public Interest Lies

The fourth traditional factor of "where the public interest lies," 107 S.Ct. at 2119, is closely akin to the habeas factor that requires consideration of the State's interest in continuing custody pending appeal. We have already stated our view of the habeas corpus factor. Consideration of the traditional "public interest" factor and the habeas corpus "state's interest" factor require essentially the same analysis.

Some prosecutors apparently entertain the untenable notion that the public interest and that of the State should be said to create some sort of a presumption that all prisoners who seek post-conviction relief are being held in custody under constitutionally valid convictions. That notion ignores the fact that this Court exercises power and habeas corpus jurisdiction under 28 U.S.C. §§ 2241–2254 which, except for minor additions and a change in wording, reflect a codification of the Judiciary Act of February 5, 1867, c. 28, § 1, 14 Stat. 385–386.

It will do well in this case, as directed in *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), "to bear in mind the extraordinary prestige of the Great Writ." *Id.* at 399, 83 S.Ct. at 827. For its "root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release." *Id.* at 402, 83 S.Ct. at 829.

---

**16.** The possibility that petitioner may "jump bond" after an appellate reversal does not alter the situation. For experience establishes that United States Marshal's Service has an excellent record of apprehending persons who jump bond in a relatively short period of time. Further, petitioner's failure to comply with the terms and conditions of his enlargement to constructive federal custody would constitute a violation of the laws of the United States, a violation of which, if proven, would add to the time petitioner would otherwise be held in custody.

Speaking directly to the question of the public's interest as represented by the State, the Court concluded that it "should be unnecessary to repeat what so often has been said and what so plainly is the case: that the availability of the Great Writ of habeas corpus in the federal courts for persons in the custody of the States offends no legitimate state interest in the enforcement of criminal justice or procedure." *Id.* at 440, 83 S.Ct. at 850. It was added that: "Surely no fair-minded person will contend that those who have been deprived of their liberty without due process of law ought nevertheless to languish in prison." [17] *Id.* at 441, 83 S.Ct. at 850.

We conclude that the fourth traditional factor cannot be weighed against Rule 23(c)'s presumption of release pending appeal.

### D.

*Braunskill* teaches that the "always substantial ... interest of the habeas petitioner will be strongest where the [three habeas corpus] factors are weakest" and that the "balance may depend to a large extent upon the determination of the state's prospect of success in its appeal." 107 S.Ct. at 2119. It is apparent from what we have stated above that it is our considered judgment that the showing made by the respondent in this case in regard to the three habeas factors must be determined to be a weak showing within the meaning of the *Braunskill* standard. For respondent made no showing at all in regard to the possibility of flight factor. Some risk of danger to the public is, of course, created by petitioner's release from state custody to federal constructive custody. Respondent, however, made no attempt to show that the risk posed by this particular petitioner is any greater than

that posed when other prisoners convicted of robbery who have criminal records similar to petitioner's record are released on parole. Further, that risk will be reduced by the terms of the enlargement order that this Court will enter in accordance with Rule 23(c).

Respondent also failed to establish that the State's interest in continuing custody pending appeal should be given any substantial weight under the circumstances of this case. The failure of the respondent to even attempt to establish a strong likelihood of success on appeal requires that the balance in favor of the petitioner's substantial interest in release may not properly be tilted to overcome Rule 23(c)'s presumption of release from state custody.

Although *Braunskill* suggests that "the formula cannot be reduced to a set of rigid rules," the Court apparently draws a distinction between the traditional factor that requires that a stay applicant make "a strong showing that he is likely to succeed on the merits," 107 S.Ct. at 2119, and a new and undefined habeas factor that the stay applicant may "demonstrate a substantial case on the merits." *Id.* at 2119–20. Respondent did not attempt to "demonstrate [that he has] a substantial case on the merits," whatever that new habeas factor may mean. *Id.* at 2120. For respondent does not even discuss such a question.

■ Should, however, it be assumed that respondent does have "a substantial case on the merits," continued custody pending appeal is not permissible in this case for the reason the respondent failed to carry the burden of establishing that "the second and fourth factors in the traditional stay analysis militate against release." *Id.* at 2120.[18] We therefore conclude that the

---

**17.** *Fay v. Noia* accurately forecast that although *Darr v. Burford*, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950), was expressly overruled in that case, "Our decision today swings open no prison gates. Today as always few indeed is the number of state prisoners who eventually win their freedom by means of federal habeas corpus. Those few who are ultimately successful are persons whom society has grievously wronged and for whom belated liberation is little enough compensation.... Habeas corpus

is one of the precious heritages of Anglo–American civilization. We do no more today than confirm its continuing efficacy." *Id.* 372 U.S. at 440–41, 83 S.Ct. at 850.

**18.** We have heretofore noted that respondent did not make any effort to show and that the record fails to establish either the second traditional factor of irreparable injury or the fourth traditional factor relating to where the public interest lies.

respondent's showing in this case "falls below the [substantial case on the merits] level" and that therefore "the preference for release should control" even if what may be a reduced standard was stated in *Braunskill.* Accordingly, an order will be entered denying respondent's application for a Rule 23(c) stay pending appeal.

We turn now to the manner in which petitioner will be "enlarged upon his own recognizance" as provided in Rule 23(c).

## IV.

### A.

28 U.S.C. § 2243 requires that this Court dispose of this case "as law and justice require." Appropriate orders will therefore be entered that will protect the interests of both parties.[19] A further order (4) will be entered that will stay the execution of those orders (1), (2), and (3) in order to afford respondent a reasonable opportunity to present a Federal Rule of Appellate Procedure 23(d) application to the Court of Appeals, should respondent elect to do so.[20]

Accordingly it is

ORDERED (1) that respondent's Rule 23(c) application for a stay should be and is hereby DENIED. It is further

ORDERED (2) that a writ of habeas corpus in the form set forth in Appendix A attached hereto should be and is hereby issued and shall be served on the respondent by the United States Marshal for this district, or by one of his designated deputies. It is further

ORDERED (3) that after petitioner is delivered into the custody of the United States Marshal or his designated deputy, petitioner shall be promptly taken before Chief Magistrate Calvin K. Hamilton or another magistrate of this Court designated by him in order that appropriate proceedings may be conducted in regard to petitioner's enlargement on his own recognizance, without surety, in accordance with Rule 23(c). Counsel for petitioner shall be appointed in order that petitioner fully understand the terms and conditions of the enlargement order, which shall be in the form set forth in Appendix B attached hereto. It is further

ORDERED (4) that execution of ORDERS (1), (2), and (3) above entered shall be stayed until Friday, July 1, 1988, in order that respondent be afforded a reasonable period of time to present a Federal Rule of Appellate Procedure 23(d) application to the Court of Appeals for the Eighth Circuit if respondent elects to do so. If respondent elects not to file an application for a Rule 23(d) stay in the Court of Appeals, he shall so advise the Court. In that event, or in the event the Court of Appeals fails to take any action pursuant to any Rule 23(d) application that respondent may file before Friday, July 1, 1988, or fails to grant a temporary stay until it may rule any Rule 23(d) application that respondent may file before that date, our stay shall no longer be effective and ORDERS (1), (2), and (3) above entered shall be executed forthwith.

## APPENDIX A

It appearing that Arlester E. Scott, petitioner, is now in the custody of Jim Jones, the proper party respondent in the above entitled cause, and it appearing that said petitioner's petition for writ of habeas cor-

---

**19.** Although the respondent has made no suggestion in regard to petitioner's enlargement on his own recognizance pursuant to Rule 23(c) and has not suggested that a possibility of flight is present in the case, we nevertheless deem it appropriate to enter order (3), *infra,* in order that petitioner may be returned to respondent's custody in the event this court's judgment granting habeas corpus relief is reversed on appeal. Order (3) is entered pursuant to this Court's habeas corpus jurisdiction rather than the Bail Reform Act, 18 U.S.C. § 3142, for the reason the later Act is only applicable to persons charged or convicted of federal offenses. *See Marino v.*

*Vasquez,* 812 F.2d 499 (9th Cir.1987), and cases cited therein.

**20.** Order (4) is issued consistent with this court's established practice when it denies an application for stay pending appeal, as illustrated by the orders entered in *Kansas City Royals Baseball Club v. Major League Baseball Players Ass'n.,* 409 F.Supp. 233, 470–71 (W.D.Mo.1976). Such a practice affords a party denied a stay pending appeal by this court prompt appellate consideration of this court's order.

pus was granted by this Court's order of June 3, 1988, and judgment having been duly entered on June 6, 1988, and it further appearing that respondent's Rule 23(c), Fed.R.App.P., application for a stay pending appeal has been this day considered and denied;

It is accordingly:

ORDERED (1) that this writ of habeas corpus is issued pursuant to Order (2) entered by this Court this day. Petitioner Scott shall therefore be released from the respondent's custody forthwith to the custody of the United States Marshal of this district (or to a deputy United States Marshal designated by him) who will, without delay, take the petitioner before the Chief United States Magistrate of this district in order that petitioner be enlarged upon his recognizance pending appellate review of this Court's order and judgment granting habeas corpus relief, all in accordance with Federal Rule of Appellate Procedure 23(c) and this Court's Order (3) entered this day. It is further

ORDERED (2) that execution of this writ is stayed until July 1, 1988, in accordance with Order (4) entered this day. Execution of this writ may be further stayed by an order of the Court of Appeals for the Eighth Circuit as provided in said Order (4).

### APPENDIX B

### ORDER ENLARGING PETITIONER UPON HIS RECOGNIZANCE PENDING APPELLATE REVIEW

In accordance with Federal Rule of Appellate Procedure 23(c) and in accordance with Order (3) entered by this Court on June 22, 1988, and after appropriate advice having been given petitioner by the undersigned judicial officer of this Court and by his appointed counsel, it is

ORDERED (1) that petitioner Arlester E. Scott should be and is hereby enlarged upon his own recognizance pending appellate review of this Court's June 3, 1988, order granting petitioner's petition for habeas corpus and this Court's June 6, 1988, judgment entered in accordance with that order. It is further

ORDERED (2) that this enlargement on petitioner's own recognizance pending appellate review is conditioned upon petitioner's acknowledgement and promise made in open court and, after the advice given by appointed counsel, to abide by any decision and the mandate of the Court of Appeals for the Eighth Circuit or the Supreme Court of the United States that may reverse this Court's order and judgment granting petitioner's petition for habeas corpus and the issuance of its writ of habeas corpus that directed petitioner's unconditional release from State custody to the constructive custody of this Court pursuant to this order. It is further

ORDERED (3) that this enlargement on petitioner's own recognizance shall be supervised by the Pretrial Services Officer of this Court and shall be further conditioned as follows:

(a) Petitioner shall not commit any offense in violation of any federal, state, or local law while on enlargement on his own recognizance pending appellate review;

(b) Petitioner shall report to the Pretrial Services Officer of this Court in the United States Courthouse, 811 Grand Avenue, Kansas City, Missouri, as that officer may direct, but in any event, not less than once each week;

(c) Petitioner shall advise the Pretrial Services Officer prior to any change in the address given by petitioner in the acknowledgement and promise portion of this order which shall be executed by petitioner as a part of this enlargement order;

(d) Petitioner shall surrender any passport(s) to the Pretrial Services Officer of this Court and shall not make application for other passport while in the constructive custody of this Court pending appellate review.

### ADVICE TO THE PETITIONER

The following advice shall be given petitioner in open court:

1. Any violation of any condition of this enlargement order entered pursuant to Rule 23(c), Fed.R.App.Proc., will result in

the immediate issuance of a warrant for your arrest.

2. You will thereafter be brought before this Court for a hearing to determine whether you may have, in fact, violated any condition of this enlargement order.

3. Should it be determined at such a hearing that any condition of this enlargement order has, in fact, been violated, the sanctions that may be imposed on such a violation may include the revocation of the release from custody granted by this enlargement order, an order of detention or a return to respondent's custody, and federal prosecution for contempt of this Court under 18 U.S.C. § 401.

If found guilty of contempt, this Court, in its discretion, may punish you by fine or imprisonment. Any term of imprisonment imposed on a finding of contempt will be imposed consecutive to the state sentence that you may be required to serve should this Court's grant of habeas corpus be reversed on appeal.

### ACKNOWLEDGEMENT AND PROMISE OF PETITIONER

I have personally read and, after receiving the advice of appointed counsel, state that I fully understand this Court's enlargement order entered pursuant to Federal Rule of Appellate Procedure 23(c). I promise and agree to fully comply with each and all of the conditions stated in that order and further agree to notify the Pretrial Services Officer of this Court promptly in the event I change the address stated below.

Witnessed By:

_____

Appointed Counsel for the Petitioner

_____

Arlester E. Scott, Petitioner

_____

Address of Petitioner

_____

City and State Tele. No.

This order is entered this _____ day of _____, 1988, by the undersigned United States Magistrate for the Western District of Missouri pursuant to this Court's Order (3) entered June 22, 1988.

_____

United States Magistrate